Luda **BLAJEI,** Plaintiff,

v.

**SEDGWICK CLAIMS MANAGEMENT SERVICES, INC., and General Motors Life and Disability Benefits Program, Defendants.**

**Civil No. 09–13232.**

United States District Court,
E.D. Michigan,
Southern Division.

July 6, 2010.

Joshua L. Ben, Allan w. Ben P.C., Bingham Farms, MI, for Plaintiff.

David M. Davis and John M. Boyda, Hardy, Lewis, Birmingham, MI, for Defendants.

***OPINION AND ORDER DENYING DEFENDANTS' MOTION TO AFFIRM ADMINISTRATOR'S DECISION [24]; GRANTING IN PART PLAINTIFF'S MOTION FOR CROSS JUDGMENT [25]; GRANTING DEFENDANTS' MOTION TO STRIKE [26]***

JOHN FEIKENS, District Judge.

Plaintiff Luda Blajei filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* During her employment at General Motors ("GM"), Plaintiff was covered by GM's Life and Disability Benefits Program ("Plan") administered by Sedgwick Claims Management Services, Inc. ("Sedgwick") and GM. Plaintiff sued Sedgwick and the Plan pursuant to ERISA § 502(a)(1)(B) alleging that Defendants have wrongly terminated her Extended Disability Benefits ("EDB"). Currently before the Court are Defendants' Motion to Affirm the Administrator's Decision Regarding Plaintiff's Claim for Extended Disability Benefits (Dkt. No. 24) and Plaintiff's Cross Motion For Judgment (Dkt. No. 25) which seeks reversal of Defendants' decision to terminate EDB. Additionally, Defendants have filed a Motion to Strike three exhibits attached to Plaintiff's Cross Motion for Judgment. (Dkt. No. 26.) The Court has reviewed the Motions, all responsive pleadings, and the administrative record, and has determined that a hearing on these matters is unnecessary. *See* E.D. Mich. LR 7.1(f)(2). The Court issues the following findings of fact and conclusions of law, and for the reasons stated below, Defendants' Motion to Strike is GRANTED, Defendants' Motion to Affirm the Administrator's Decision is DENIED, and Plaintiff's Cross Motion For Judgment is GRANTED IN PART.

## I. Findings of Fact

### A. The Disability Plan

The ERISA-governed Plan in this case is funded by GM and claims are administered by Sedgwick and GM. Under Article III, § 3.04(a) of the Plan, GM has delegated to Sedgwick discretionary authority to interpret the Plan and to evaluate claims under the Plan:

The Corporation [GM], as the Program Administrator, shall be responsible for

the administration of the Program.... *The Program Administrator expressly reserves the right to construe, interpret and apply the terms of this Program. In carrying out its responsibilities under the Program, the Carrier [Sedgwick] also shall have discretionary authority to interpret the terms of the Program and to determine eligibility for and entitlement to Program benefits in accordance with the terms of the Program.* Any interpretation or determination made by the Program Administrator or the Carrier, pursuant to such discretionary authority, shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(A.R. at 25–26 (emphasis added).)

Article IV, § 4.08 of the Plan defines eligibility for EDB. That section requires an employee to submit satisfactory evidence of disability to Sedgwick, and grants Sedgwick the right to require an employee to submit to a physical examination as a condition for EDB. Specifically, that section states:

(a) Eligibility

\* \* \*

For an Employee to be totally disabled, such Employee must not be engaged in regular employment ... and, on the basis of medical evidence satisfactory to [Sedgwick], the Employee must be found to be wholly prevented from engaging in regular employment or occupation with the Corporation at the location where the Employee last worked ... as a result of bodily injury or disease, either occupational or non-occupational in cause.

\* \* \*

(e) Proof of Disability

[Sedgwick] may require an Employee, as a condition of eligibility, to submit to examinations by a physical designated by it for the purpose of determining such applicant's initial or continuing disability.

(A.R. at 50–51, 59.)

The Plan also details the process for appealing a denial of EDB. The initial claim decision is made by Sedgwick. (A.R. at 26.) If the employee is denied a claim for benefits, the employee may first appeal to Sedgwick within 180 days "following receipt of the formal notification letter from [Sedgwick]" denying the claims. (A.R. at 26–27.) As a second-level appeal, the Plan provides that "[t]he Employee may appeal, within 60 days to the Plan Administrator," i.e., General Motors. (A.R. at 27–28.) Finally, if an employee is unsatisfied with the decision of GM, the employee may appeal to the General Motors Employee Benefit Plans Committee. The Plan provides that "[t]he decision of the Employee Benefit Plans Committee is final and binding." (A.R. at 28–29.)

### B. Plaintiff's Injury

Plaintiff is a 57–year–old woman who worked as a project engineer for GM for over ten years, from 1994 through March 11, 2005. (A.R. at 313.) In that capacity, she reviewed field data for safety issues. (A.R. at 193.) Blajei's job at GM was a sedentary one, requiring her to sit at a computer for eight hours per day. (A.R. at 424.)

On July 15, 2004, Plaintiff was in a car accident. The record indicates that prior to the accident, Plaintiff already had a history of back pain and suffered from degenerative disc disease. (A.R. at 368, 710, 1326.) Blajei states, however, that her back problems were exacerbated by the accident. The accident resulted in a severe damage to her vehicle; Plaintiff did not seek immediate medical treatment, however, and returned to work shortly after the accident. (A.R. at 376, 1015.) Plaintiff states that during the eight-

month period following the accident, discomfort in lower back became progressively worse. (A.R. at 193, 376.) In December 2004, an MRI of Plaintiff's spine was taken which revealed degenerative changes in her cervical vertebrae and left neural foraminal narrowing at multiple locations in her cervical spine. (A.R. at 559.) By March 2005, Plaintiff states that she was suffering from numbness in both her lower legs and right upper arm. (A.R. at 193, 376.) Additionally, she was experiencing pain across her lower back which was made worse by prolonged sitting. (*Id.*) Due to these issues, her last day of work at GM was March 11, 2005. (A.R. at 313.)

## C. Plaintiff's Treatment And Diagnosis During The Short Term Disability Period

On March 8, 2005, Plaintiff filed for Sickness and Accident ("S & A") benefits, i.e., short-term disability. In support of her S & A benefits claim, she submitted an attending physician statement from her long-time treating physician, an internist, Dr. Feinstein. (A.R. at 313–314.) Dr. Feinstein noted that Plaintiff complained of low back pain radiating to her right leg and accordingly diagnosed her with lumbosacral radiculopathy.[1] (*Id.*) Dr. Feinstein's conclusion during this time period was that Plaintiff was unable to work due to her back problems. (A.R. at 314 (March 2005 S & A statement); A.R. at 318 (June 2005 supplement statement); A.R. at 322 (August 2005 attending physician's statement).) In April 2005, an MRI of Blajei's spine revealed degenerative disc disease, and a protrusion of one of her lumbar

discs. (A.R. at 319, 1420.) Based on Dr. Feinstein's statement and supplemental attending physician statements by other doctors, Plaintiff was awarded S & A benefits.

During the spring and into the summer of 2005, Plaintiff sought the consultation of an orthopedic surgeon, Dr. Hassan Hammoud. The reports from Dr. Hammoud's exams show that Plaintiff suffered from a reduced range of movement in her cervical, thoracic, and lumbar spine. At Dr. Hammoud's initial exam, Plaintiff could only flex, extend, and rotate her head at 50% of the normal range. (A.R. 1418–19.) Dr. Hammoud's report also reflects that Plaintiff complained of "sharp and shooting pain in the neck [which] is aggravated by any movement;" Blajei reported this pain to be an "8" on a 1 to 10 pain scale. (A.R. at 1417, 1424.) Dr. Hammoud reviewed an MRI taken in June 2005 and concluded that it showed cervical spondylosis.[2] (A.R. at 1430.)

In July 2005, Plaintiff underwent the first of four independent medical exams ("IME") at the request of Sedgwick. Dr. Xeller, an orthopedic surgeon, reviewed the June 2005 MRI and concluded that there were disc bulges in Plaintiff's cervical spine. (AR. at 216.) In a section of his report labeled "Objective Findings," Dr. Xeller stated:

> In regards to her cervical spine, she has significant compression with some spinal stenosis[3] seen on MRI, and she has complaints of pain down her arm. She tells me a surgeon has advised that she is a candidate for a neck fusion, and I would agree.

---

1. Radiculopathy is a "disorder of the spinal nerve roots." Stedman's Medical Dictionary at (27th ed.2000).

2. Spondylosis is "ankylosis of the vertebra." Stedman's Medical Dictionary (27th ed.2000). Ankylosis is the "stiffening or fixation of a

joint as the result of a disease process, with fibrous or bony union across the joint." *Id.*

3. Stenosis is the "stricture of [a] canal or orifice." Stedman's Medical Dictionary (27th ed.2000).

(A.R. at 218.) His conclusion was that Blajei could return to work with restriction that computer time be limited to *four hours per day.* (*Id.* (emphasis added).) Given that Plaintiff's job at GM required her to sit at a computer for eight hours per day, GM notified Plaintiff that they were unable to accommodate her within the restrictions set out by Dr. Xeller. (A.R. at 219.) As such, Plaintiff continued to receive S & A benefits.

Dr. Hammoud referred Plaintiff to a neurosurgeon, Dr. Fernando Diaz. Upon reviewing the June 2005 MRI, Dr. Diaz reached a conclusion similar to Drs. Hammoud and Xeller regarding Plaintiff's cervical spine: the MRI revealed "evidence of a severe degenerative disc disease with spondylitic changes at C4–C5 and C5–C6." (A.R. at 1440.) Dr. Diaz additionally concluded that the June 2005 MRI showed "severe degenerative disc disease at the L5–S1 level with disc space narrowing." (A.R. at 1440.) Given his physical examinations of Plaintiff, and his review of the June 2005 MRI, Dr. Diaz recommended that Plaintiff undergo disc-replacement surgery at the L5–S1 level. (A.R. at 1440.)

In July 2005, at the request of the automobile insurance company handling a claim arising out of Blajei's car accident, Dr. Phillip Friedman, a neurosurgeon, conducted an IME of Plaintiff. Dr. Friedman noted that his exam "was not confirmatory of cervical radiculopathy," and that a diskography of Plaintiff's L5–S1 level "did not reproduce the patient's symptoms." (A.R. at 1326.) However, he also concluded that "Ms. Blajei ... does have evidence of some advanced degenerative changes in [her] lumbar spine" and that her "cervical spine [also] showed ... degenerative changes." (A.R. at 1326.) His final diagnosis was "cervical spondylosis, possible cervical nerve root irritation," and "degenerative disc disease with diskogenic back pain." (A.R. at 1327.) He concluded that "the claimant *is not able to return to normal daily activities, i.e., work activities* and household chores." (A.R. at 1326 (emphasis added).)

On August 10, 2005, Plaintiff underwent the disc replacement surgery recommended by Dr. Diaz. In his notes immediately following the surgery, Dr. Diaz commented on Plaintiff's improved condition. Immediately following the surgery, Dr. Diaz reported that "[d]uring the day, she is able to get up and ambulate with relatively little discomfort." (A.R. at 1454.) And his September 2005 report states, "The pain in the back is mostly improved and the pain in the leg is only present occasionally." (A.R. 1457.) However, the record reflects that the surgery did not resolve all of Blajei's lumbar spine pain and that she continued to have pain stemming from her un-operated cervical spine. (*See* A.R. at 1537 (Nov. 2005, Dr. Grias report); A.R. at 1540 (Dec. 2005, Dr. Grias report); A.R. Supp. at 386 (Nov. 2005, Dr. Kurz report).)

In November 2005, Blajei had her initial visit with Dr. Kurz, an orthopedic surgeon. (A.R. Supp. at 386.) Dr. Kurz reviewed a cervical MRI and found that the "scan shows multiple level cervical spondylosis and there are various disc protrusions and neural foraminal narrowing," but concluded that "I do not see any spinal cord compression or any large disc herniation." (A.R. Supp. at 387.) Dr. Kurz recommended an EMG of both legs; the results of that test "suggested no radiculopathy." (A.R. Supp. at 388.) Around this time a CT myelogram of Plaintiff's spine was taken which was "unremarkable." (A.R. at 1050.) In March 2006, Blajei had a return visit to Dr. Diaz who reported that with regard to Plaintiff's lower back surgery, "[s]he [previously] had some back pain that has totally resolved and the radicular complaints that she had are also resolved."

(A.R. at 1051.) Dr. Diaz acknowledged, however, that Plaintiff was still reporting pain in her neck which he believed was "cervical spondylitic disease." (A.R. at 1051.)

In January 2006, Plaintiff consented to the second of four IMEs at the behest of Sedgwick. This exam was performed by Dr. Emmanuel Obianwu, an orthopedic surgeon. Dr. Obianwu recognized that Plaintiff "has significant degenerative disc disease in her neck and lower back," and found that she could only rotate her head about 30% of normal, and extension and flexion of the cervical spine was 10% and 20% of normal, respectively. (A.R. at 198.) He also found that the June 2005 MRI "revealed significant cervical spondylosis with involvement of multiple levels." (A.R. at 198.) Despite these findings, Dr. Obianwu concluded that "she is able to sit and there are no findings on clinical examination today that would preclude sitting." (A.R. at 199.) As such, he recommended that she could return to work activities "with restrictions of sedentary tasks *only for four hours each day* for the next four weeks." (A.R. at 199.) Because GM could not accommodate Plaintiff within the restrictions set out by Dr. Obianwu, Plaintiff remained on S & A benefits until the one-year S & A term expired on March 20, 2006. (*See* A.R. at 1617, 2135.)

### D. Initial Grant and Subsequent Termination of Plaintiff's Extended Disability Benefits

#### 1. Initial Grant of Extended Disability Benefits

On March 16, 2006, GM sent Plaintiff a letter informing her that she was approved for EDB in the amount of $3,624.00 per month to begin on March 21, 2006. (A.R. at 386.) Around this time plaintiff began seeing a new primary treating physician, an internist, Dr. Alexander Vertkin.

In May 2006, Dr. Vertkin referred Plaintiff to a specialist in neurology, Dr. Eilender. Dr. Eilender found that Plaintiff did not have "excessive pain" from palpation, and that she had a "relatively" full range of motion in her neck and lumbosacral spine. (A.R. at 369.) Notwithstanding these findings, he reaffirmed that Plaintiff had "degenerative disc disease of the cervical and lumbar spine." (A.R. at 369.) On July 19, 2006, Dr. Eilender performed a neurological exam of Plaintiff; the corresponding report provides that "her EMGs of both upper extremities and both lower extremities are now completely within normal limits, with no evidence of any pinched nerves, or anything that is abnormal." (A.R. at 373.) Dr. Eilender's diagnosis was that Plaintiff "has chronic pain syndrome" but that her "EMG failed to show any problems with lumbar or cervical radiculopathy." (A.R. at 374.)

In September 2006, Plaintiff underwent two additional IMEs at the request of the automobile insurance company. The first was conducted on September 25, 2006, by Dr. William Higginbotham, an orthopedic surgeon. He performed a physical exam of Plaintiff and reviewed Plaintiff's medical records. (A.R. at 456). Dr. Higginbotham concluded that a cervical MRI "shows evidence of cervical spondylosis between C2 and C7, which some degenerative osteophytes noted posteriorly along the neural foraminea." (A.R. at 456.) Dr. Higginbotham's diagnosis was that Plaintiff suffered from "symptoms of cervical radiculopathy, mild on the right side." (A.R. at 456.) He noted that while her symptoms were "primarily" subjective, Plaintiff did have "objective evidence of lumbar radiculopathy on the left side." (A.R. at 456.) Two days later, she was again examined by Dr. Friedman at the request of the auto insurance company. Dr. Friedman reported that Plaintiff's symptoms "appear to have been related to advanced degenerative disk disease."

(A.R. at 463.) He concluded, however, that "many of the symptoms appear to be medically inexplicable in view of the absence of any significant nerve root compression seen on the MR scan and a negative EMG." (A.R. at 464.)

### 2. Termination of Extended Disability Benefits

On October 26, 2006, Plaintiff submitted to a third IME at the request of Sedgwick; this exam was again conducted by Dr. Obianwu who had also conducted the January 2006 IME. Despite reviewing similar records and making similar clinical findings as in that earlier exam, Dr. Obianwu came to a different conclusion. In January 2006, Dr. Obianwu found that Plaintiff could perform "sedentary tasks only for four hours each day." (A.R. at 1647.) In contrast, in October 2006, Dr. Obianwu stated that Plaintiff could return to full-time work under a "sit/stand" option:

Ms. Blajei appears to be having rather extensive treatment for her neck and lower back problems. She has a lot of complaints with respect to sitting, standing, but overall I do not recognize a problem that would prevent her from sitting. Her work is mainly sedentary. At this time, she can return to work with the restrictions of a sit/stand option and no lifting over 25 pounds for the next three months because of her multiple disc problems in her neck, thoracic and lumbar spine. With such restrictions, I do not envisage this woman having any difficulty returning to her regular duties.

(A.R. at 1638–39.)

Based on Dr. Obianwu's report, GM requested that Plaintiff return to work. On November 6, 2006, Plaintiff went back to her job at GM but lasted only four hours because of her back pain. (See A.R. at 437.) On November 30, 2006, GM informed plaintiff that "[y]ou are hereby no-

tified that you are required to report to work on Wednesday, December 6, 2006, or to otherwise contact the [GM Benefits & Service Center] to explain your absence." (A.R. at 437.) In response, on December 8, 2006, Plaintiff sent the following to the GM Benefits & Service Center: (1) an August 2006 statement by her treating physician, Dr. Vertkin, stating that she was "currently totally disabled"; (2) a December 2006 statement by Dr. Vertkin stating that Plaintiff is "totally unable to work"; and (3) a Physical Capacities Evaluation form ("PCE"), completed by Dr. Norman Koplad on November 16, 2006, stating that Plaintiff could not sit for more than 30 minutes at a time, and not more 3 hours total over the course of an 8–hour workday. (A.R. at 466–71.)

On December 18, 2006, Plaintiff was informed that Sedgwick had completed review of her claim and that disability benefits would be terminated. (A.R. at 442.) The letter did not cite Dr. Obianwu's October 2006 IME as a basis for denial, nor did the letter refer to any of the supporting documents that Plaintiff had submitted on December 8, 2006. (Id.) Rather, the letter explained that benefits were being denied on a purely procedural basis:

Under the [Plan], written notice of a disabling injury or sickness must be given to the insurance company within 20 days of the commencement of disability. According to the information in the claim file, you last worked on November 6, 2006, and claimed disability from November 8, 2006. However, you did not request a claim form until December 4, 2006.

(Id.) The letter informed Plaintiff that she had 180 days to appeal to Sedgwick. (Id.)

### 3. Plaintiff's First Appeal of Sedgwick's Termination of Extended Disability Benefits

On June 5, 2007, Plaintiff appealed Sedgwick's decision to terminate EDB by

submitting a voluminous set of medical records totaling close to 500 pages. (A.R. 472–965.) Among the documents submitted were attending physician statements from her treating physicians, Drs. Feinstein and Vertkin, along with their medical records, as well as objective test reports such as MRI, x-ray, and CT scan reports. Both Drs. Feinstein and Vertkin attested that Plaintiff was disabled from employment, with the latter's statement being dated May 29, 2007—just days before the June 5, 2007, appeal letter was sent to GM. (A.R. at 489–90, 1722–25.)

On July 16, 2007, the Defendants notified Plaintiff that her appeal had been denied. The basis was the same procedural hook as before: that Blajei had provided GM "untimely notification" of her claim for disability after working for a half-day. (A.R. at 971.) In response, Plaintiff filed suit in this Court seeking a reversal of the denial of benefits premised on this procedural grounds. The suit resulted in a stipulated order: Plaintiff would drop her claims and Defendants agreed to discontinue asserting the "untimely notification" as a basis for denying EDB. (A.R. 991–1004.)

Following the stipulated order, Sedgwick apparently had not made a final determination as to whether Plaintiff was "wholly prevented from engaging in regular employment [at GM]" so as to qualify for EDB under the Plan. An October 16, 2007, entry in Sedgwick's case notes for Blajei provides:

> We have been instructed by GM counsel to review the medical evidence submitted by Plaintiff's (the claimant's) counsel, take whatever steps are necessary to determine whether Plaintiff continues to be disabled, included but not limited to obtaining records from her physicians, having the file reviewed by independent medical consultants, and/or having the Plaintiff examined by physicians selected by [Sedgwick].

(A.R. at 274). Pursuant to this directive, Sedgwick engaged in a number of activities to determine Plaintiff's disability. On October 19, 2007, Sedgwick contacted Dr. Vertkin to inquire about Plaintiff's status. He informed Sedgwick that while "he was aware that she had a sit down job at a computer," it was his medical opinion that her current condition prevented her from working at GM. (A.R. at 273–74.) On October 23, 2007, and again on October 26, 2007, Defendants conducted surveillance of Plaintiff; they did not find that she was engaging in any activities inconsistent with Dr. Vertkin's diagnosis. (A.R. 973–78.) Apparently satisfied that Plaintiff was disabled under the Plan, Sedgwick informed Plaintiff that she would receive EDB for the period December 4, 2006, through August 3, 2007. (A.R. 1010–11.) The letter explained that EDB were granted only through August 3, 2007, because that was the last time Plaintiff had been examined by Dr. Vertkin. (A.R. at 272–74.)

On November 7, 2007, Plaintiff submitted to a third IME at Defendant's request. This time Blajei was examined by Dr. A.N. Sinha, an orthopedist. Dr. Sinha noted that during his exam Plaintiff "did not appear to be in any discomfort or pain during the interview phase . . . while she was seated on the regular chair for over 30 minutes." (A.R. at 1016.) He recognized, however, that there was objective evidence of Plaintiff's condition:

> I have reviewed her extensive medical records which extends over a period of several years. Significant ones are those of the MRI of the cervical and lumbosacral spine. The MRI reports *do confirm* the presence of degenerative disc disease at multiple levels, especially C4–C5–C6 with some left neural foraminal narrowing. Similarly, the MRI of the lumbosacral spine *also confirmed* the presence of degenerative disc dis-

ease, especially at L5–S1 level, for which she has been operated by Dr. Diaz.

\* \* \*

Clinically, this lady does have symptoms of mild cervical radiculopathy on the right side, most likely with involvement of C5–C6 nerve roots in her neck.

(A.R. at 1017 (emphases added).) Without explaining his disagreement with the objective report findings, Dr. Sinha concluded that Plaintiff could return to work:

Currently, she is on minimal treatment, taking Lyrica for neuropathy/radiculopathy and Ultracet for relief of pain. She is able to drive and her job being purely working with computers in a sit-down position, *I think she should* be able to return to work, *pending surgery to her neck,* which she is planning to undergo in the near future. The surgery of the cervical spine if performed will involve C5–6 anterior fusion. However, I must add that the MRI of the cervical spine indicated neural foramina, mostly on the left side, but her symptoms involve the right upper extremity. Therefore there is some inconsistency between her complaints and the findings on the MRI. Thank you for your referral.

(A.R. at 1018 (emphases added).)

Because Dr. Sinha's report suggested that he thought Plaintiff could only return to work "pending surgery to her neck," Sedgwick contacted Dr. Sinha for clarification. The corresponding entry in Sedgwick's case notes states:

[Dr. Sinha] doesn't understand why there is any problem with the narrative and the way he wrote his determination.... Dr. Sinha states that the [employee] was definitively 'able' especially since she had a sit down job; there was no reason she could not work. I explained the importance of adhering to contractual language; there cannot be any room for misinterpretation of IMO determinations.

(A.R. at 244.) After Sedgwick's call, Dr. Sinha submitted the following amended conclusion to his report:

Currently, she is on minimal treatment, taking Lyrica for neuropathy/radiculopathy and Ultracet for relief of pain. She is able to drive and her job being purely working with computers in a sit-down position, *therefore she is able to return to work.*

Thank you for your referral.

(A.R. at 244 (emphasis added).)

On November 20, 2007, Sedgwick notified Plaintiff that she would receive no disability benefits beyond August 3, 2007. (A.R. at 1070.) The denial letter sets forth two independent reasons for this decision. The first is a missed IME which the letter explained deprived Sedgwick of "its right to have an examination as provided by the Plan." (*Id.*) The missed IME was scheduled on extremely short notice, however. Just two days prior to the scheduled exam, Defendants sent Plaintiff a Fed–Ex. (*Id.*) This Fed–Ex was left at Plaintiff's front door at 1:45 p.m. the day before the exam, and the record is unclear as to when Plaintiff ultimately received the letter. (A.R. at 262, 1008.) Defendants also left Blajei a voice-mail the day before the exam. (A.R. at 1070, 2257.) Although Plaintiff missed this short-noticed exam, Dr. Sinha performed an IME at Sedgwick's request less than two weeks later. (A.R. at 1070.)

The second reason cited in the denial letter was Dr. Sinha's evaluation. In this regard, the extent of the Sedgwick's explanation was that

on November 7, 2007, you underwent an examination by a physician of our designation. The examination was performed by Dr. Sinha, a specialist in Orthopedics. It was determined at this examination that you were able to resume the duties of your occupation. On this basis, full payment of this claim for disability will

remain payable thru August 3, 2007, pending submission of additional medical certification.

(A.R. at 1071.) The letter informed Plaintiff that she had 180 days to appeal Sedgwick's decision. (*Id.*)

### 4. *Plaintiff's Second Appeal of Sedgwick's Termination of Extended Disability Benefits*

On May 12, 2008, Plaintiff initiated her second appeal. As provided by the Plan, this appeal was to the Plan Administrator, GM. (A.R. at 27–28, 2136.) In support of this appeal, Blajei's then-attorney provided a 40 page letter excerpting various findings by her treating physicians that supported her claim of disability. Plaintiff also submitted 32 lengthy attachments, totaling well over 1,000 pages of various medical records and diagnostic and imaging reports. Although the overwhelming majority of the medical information had been previously submitted, Plaintiff provided some additional findings by her Physicians, including:

- an August 3, 2007, exam by Dr. Vertkin noting that Blajei was reporting "burning pain in her back, upper mid, and the lower pack as long as she sits for more than 15 minutes," (A.R. Supp. at 381);

- an October 3, 2007, exam by Dr. Vertkin reporting that "according to the patient she tried to do some physical activity at home and her pain was exacerbated to the point that she was crying. Today she is in a mild distress because of the pain. The patient is in soft neck collar in the office," (A.R. Supp. at 382);

- a November 2, 2007, study performed by a Dr. Aronov, comparing Plaintiff's December 2004 cervical MRI against a February 2007 cervical MRI and finding that at the "C4–C5 level ... there

is uncovertebral and endplate spurring, resulting in bilateral moderate to severe neural foraminal narrowing which may have progressed since the previous exam," and concluding that "as compared to 12/30/2004 examination, there is progressive degeneration," (A.R. Supp. at 411–12);

- a November 14, 2007, exam by Dr. Vertkin referencing Dr. Aronov's study and remarking that it "showed that the patient has worsening from the previous MRI from 2004 that showed C3 and C4 progressive narrowing of bilateral neural foramina C3–C4 and C4–C5 and mild narrowed spinal canal in the level of C5–C6 and C6–C7. The Ultracet I prescribed for the patient for the pain is not helping her much and after any kind of physical activity experiences severe pain," (A.R. Supp. at 383).

In response to this appeal, Sedgwick's Corporate Consulting Physician, Dr. Robert Pick, an orthopedic surgeon, conducted a file review of close to 600 pages of Blajei's medical records and case notes. (A.R. at 1621, 2136.) The entirety of Dr. Pick's file-review report is five pages, and the substantive portion is less than three pages. (A.R. 1622–24.) At the outset, the report notes that two phone calls were made to Plaintiff's treating physician, Dr. Vertkin. The first was made at 4:20 p.m. on Thursday, May 22, 2008, but Dr. Pick was unable to reach anyone and did not leave a message. (A.R. at 1622.) The second call was made the next morning, Friday, May 23, 2008; the report indicates that Dr. Pick left Dr. Vertkin a message to call him back. (A.R. at 1622.) Although no callback was received, it is noteworthy that Dr. Pick filed his report on Tuesday, May 27, 2008—the next business day.[4] (A.R. at 1622.)

---

4. In 2008, Memorial Day was observed on Monday, May 26.

Dr. Pick's report next provides an "Orthopedic Synopsis" which consists of little more than twenty excerpts from selected reports of Plaintiff's treating physicians and specialists, and the auto insurer's physician consultants. (A.R. at 1622–24.) Notably, there is no mention of any report from Dr. Feinstein, Plaintiff's treating physician through April 2006. With respect to Plaintiff's second treating physician, Dr. Vertkin, the entirety of Dr. Pick's report contains four excerpts from Dr. Vertkin's office notes.[5] (A.R. at 1623.) Beyond these excerpts, Dr. Pick's report does not include any further discussion of Dr. Vertkin's records, nor does it provide any reason why he disagreed with those Dr. Vertkin's diagnoses. (*See* A.R. at 1622–24.)

Dr. Pick's report concludes, in relevant part:

> Based on review of the extensive medical documents provided, and no callback by the attending physician, to a reasonable degree of medical certainly [sic], the medical documentation does not substantiate total disability from full-time gainful employment. . . .

Dr. Sinha stated in his [IME report] ". . . She is able to drive and her job being purely working with computers in a sit-down position, I think she should be able to return to work, pending surgery to her neck, which she is planning to undergo in the near future. . . ."

RATIONALE: There is extensive subjective symptomatology, which the voluminous records reflect are all attributable by the employee to an alleged [motor vehicle accident] in 2004. There is paucity of objective findings both clinically, as well as on extensive diagnostic testing. Based on information provided, the employee was able to engage in full-time gainful employment, at least in the sedentary category.

(A.R. at 1624.)

As a result of Dr. Pick's file review, on June 16, 2008, GM sent Plaintiff a letter denying her second appeal. (A.R. at 2256–58.) The letter does not discuss any of the medical information that Plaintiff submitted, nor does it explain what was deficient about Plaintiff's evidentiary support for her claim. As with the previous denial letter, this one asserted two bases for de-

**5.** For completeness, the following is a reproduction of Dr. Pick's report as it pertains to Dr. Vertkin's diagnoses:

> A 01/29/07 office note by Dr. Vertkin states, "On 12/05/06, she has been evaluated for her problems at Southfield Neurological Associates by Dr. Bruce Kole. I discussed the findings of Dr. Kole from his letter he sent to me . . . still has continuous burning and pain in her lower back and radiation to both hips with difficulty sitting more than 10–15 minutes. The patient has to have frequent rest lying down. Also, she has numbness in both of her hips. Although, the patient did not have any objective findings on an EMG, but subjectively she still has the same complaints." Physical examination was unremarkable. Impression was continuous pain in low back with radiation to both hips and legs secondary to the previous motor vehicle accident and a previous surgery.

> Dr. Vertkin's note dated 03/21/07 provides an impression of "cervicalgia, chronic myofascial pain, and low back pain, status post surgery of the lumbar spine, chronic pain and numbness in the left leg."

> A 05/29/07, four-page Physician Statement by Dr. Vertkin indicates that he is board certified in Internal Medicine. Diagnoses consist of:
> 1. Neck spondyloarthropathy.
> 2. Herniated discs at C3–4, C4–5, C5–6, and C6–7.
> 3. Radiculopathy.
> 4. L5–S1 disc with artificial disc placement (2005).
> 5. Chronic pain.

> An 08/03/07 office note by Dr. Vertkin provides an impression of "status post motor vehicle accident, status post neurosurgery with continuous myofascial pain and neuropathic pain."

nying Plaintiff's claim for benefits. First, the letter explained that it was Dr. Pick's professional opinion that the medical documentation does not substantiate total disability from full-time gainful employment, and that Dr. Sinha's [IME] report from November 7, 2007, accurately reflects that Ms. Blajei was able to perform the duties of her employment as of November 7, 2007.

(A.R. at 2258.) Second, the letter again cited the "missed" exam with Dr. Sinha as grounds for denying benefits:

> In addition, *there has been no medical evidence provided that would allow us to overlook Ms. Blajei's failure to report for the October 24, 2007, [IME]* or the results of [Dr. Sinha's] November 7, 2007, examination. Therefore, we must continue to advise that no further benefits are payable on your ... claim subsequent to October 23, 2007.

(A.R. at 2258 (emphasis added).)

### 5. Plaintiff's Third, and Final, Appeal of Defendants' Termination of Extended Disability Benefits

On August 15, 2008, Plaintiff appealed GM's decision to the GM Employee Benefits Plan Committee ("GM EBPC"). (*See* A.R. at 156–68.) Dr. Joel Bender, the GM Corporate Medical Director, conducted a file review to determine whether Blajei was able to return to work. (A.R. at 2136.) On September 22, 2008, Dr. Bender completed his review of Plaintiff's file, and it purportedly was his conclusion that there were insufficient objective medical findings to support Plaintiff's inability to perform her work duties. (A.R. at 2136.) Curiously, Dr. Bender did not draft a report summarizing his conclusions; rather he discussed his findings orally with a GM Employee Benefits and Human Resources employee handling Blajei's claim. (A.R. at 231; Meyers Decl. at ¶ 7.)

On October 15, 2008, Jeffery Johnson, Secretary of the GM EBPC, drafted a four page report to the rest of the EBPC "request[ing] that the [EBPC] ... review and make a final determination with respect to [Plaintiff's] appeal." (A.R. at 2134.) As to the IME of Dr. Sinha, and the file reviews conducted by of Drs. Pick and Bender, the letter does not detail the consultants' findings but merely restates their conclusions that Plaintiff is able to return to work. (A.R. at 2136.) It also appears that the reports of Drs. Sinha and Pick were not attached to the letter circulated to the EBPC. (*See* A.R. at 2134–2259.) Nor does the record indicate how Dr. Bender's findings that were conveyed orally to the GM Employee Benefits and Human Resources employee were subsequently conveyed to Johnson. Johnson's letter concludes by citing the missed exam as a basis for denying benefits:

> *Conclusion:*
> There has been no medical evidence provided that would allow us to overlook Ms. Blajei's failure to report for the October 24, 2007[IME] or the subsequent able results of the November 7, 2007 examination [by Dr. Sinha]. Ms. Blajei's disability benefits were terminated effective October 23, 2007 as provided under Article IV, 4.08(e) of the [Plan] which states "The Carrier may require an Employee, as a condition of eligibility, to submit to examinations by a physician designated by it for the purpose of determining such applicant's initial or continuing disability."
> *Recommendation:*
> The Employee Benefits Plan Committee is requested to determine that the denial of disability benefits under the [Plan] was appropriate.

(A.R. at 2137.)

On October 15, 2008—the very same day that Johnson's report was submitted to the GM EBPC—the EBPC sent Plaintiff a half-page letter summarily denying her

claim. (A.R. at 2138.) The letter did not set forth any reasons for the denial. (*Id.*)

## II. Conclusions of Law

### A. Defendants' Motion To Strike

■ As a preliminary matter, I will address Defendants' Motion to Strike the three exhibits attached to Plaintiff's Cross Motion for Judgment. (Dkt. No. 26.) These exhibits are (1) a letter dated February 12, 2010 from the Social Security Administration ("SSA") informing Plaintiff that she was entitled to disability benefits; (2) a page from "The Ultimate Back Book"; and (3) a scientific article titled "Biomedical Effects of Sitting With Adjustable Ischial and Lumbar Support On Occupational Low Back Pain." (Dkt. No. 25, Exhs. A–C.) Defendants moved to strike these exhibits on the grounds that evidence outside of the administrative record may not be considered by a reviewing court. (Dkt. No. 26.) Plaintiff concedes that the exhibits are not part of the administrative record, but argues that because the evidence is offered in support of a procedural challenge to the administrator's decision, they should be considered. (Dkt. No. 28 at 1–2.)

■ Generally, in a case involving claims for wrongful denial of benefits under ERISA § 502(a)(1)(B), the court may not consider evidence outside the administrative record. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618–19 (6th Cir.1998) (Gilman, J., concurring); *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir.1998) ("There can be no dispute that in this circuit, in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator."). However, there is an exception to this general rule: a district court may look beyond the record "if [the non-record] evidence *is offered in support*

of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins*, 150 F.3d at 619 (emphasis added); *see also Geer v. Hartford Life and Acc. Ins. Co.*, No. 08–12837, 2009 WL 1620402, at *2 (E.D.Mich. June 9, 2009) ("A district court may consider evidence outside of the administrative record, but *only* if that evidence is offered in support of a procedural challenge to the plan administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part."). In her Cross Motion for Judgment, Plaintiff asserts that Defendants have violated her ERISA due process rights by failing to "provide adequate notice" as to the reasons her benefits were denied. (*See* Dkt. No. 25 at 26–31 (citing 29 U.S.C. § 1133).) As such, Plaintiff argues, the exhibits extrinsic to the administrative record should be considered.

Plaintiff has raised the type of procedural challenge that would allow a court to look beyond the administrative record. In *Wilkins*, the concurrence cited *VanderKlok v. Provident Life and Accident Ins. Co., Inc.*, 956 F.2d 610 (6th Cir.1992) as an example of a due process violation that would warrant examining documents outside the record. In *VanderKlok*, as here, the insured asserted that the administrator's denial letters failed to provide adequate notice as to the reasons for denying benefits as required by ERISA § 503, 29 U.S.C. § 1133. 956 F.2d at 616–17.

The problem with Plaintiff's argument, however, is that the exhibits attached to her Cross Motion for Benefits cannot be said to be "offered in support" of her procedural challenge. *See Wilkins*, 150 F.3d at 619. The first exhibit, a letter from the SSA informing Plaintiff that she had been awarded disability benefits, is offered to show that Defendants erred in

denying benefits given that the SSA decided differently. However, this assertion is not procedural in nature; the SSA award has no bearing on whether Defendants' denial letters adequately explained why Plaintiff's benefits were denied. (*See* Dkt. No. 28 at 2.)[6] As for the other two non-record exhibits, the page from "The Ultimate Back Book" and the scientific article, Plaintiff offers these in support of the argument that sitting places more strain on the back than standing. (Dkt. No. 25 at 35–56.) Regardless of the validity of this argument, there is simply no tie between it and the alleged failure on the part of Defendants to comply with the procedural requirements set out by ERISA. These two exhibits, like the SSA determination, are not "offered to support" of Plaintiff's due process claim. *See Wilkins*, 150 F.3d at 619.

Accordingly, I GRANT Defendants' Motion to Strike Material Contained in Plaintiff's Cross Motion for Judgment. Further, it follows from the forgoing analysis that the Court's review of the Defendants' decision to deny benefits will be limited to the contents of the administrative record. *See Killian*, 152 F.3d at 522.

### B. Sedgwick and GM's Termination Of Extended Disability Benefits

#### 1. Applicable Standard of Review

■ In a denial of benefits case brought under ERISA § 502(a)(1)(B), a decision by the plan administrator is reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If a plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the reviewing court examines that administrator's determination under the highly deferential arbitrary and capricious standard. *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir.2009); *accord Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983–84 (6th Cir.1991).

■ Plaintiff argues that I should examine the Defendants' decision *de novo* because "[n]othing in the GM policy can be interpreted as properly designating Sedgwick CMS as possessing the [requisite] discretionary authority." (Dkt. No. 25 at 24.) This argument overlooks the plain language of the Plan. Under Article III, § 3.04(a), the Plan expressly delegates to Sedgwick discretionary authority to both interpret the Plan's terms and to evaluate Plaintiff's claim for benefits: "In carrying out its responsibilities under the Program, [Sedgwick] also shall have *discretionary authority to interpret the terms of the Program and to determine eligibility for and entitlement to Program benefits* in accordance with the terms of the Program." (A.R. at 25–26 (emphasis added).) The Sixth Circuit has recognized nearly identical language as a clear grant of discretion to the Plan administrator. *See e.g.,*

---

**6.** Moreover, the February 2010 SSA letter informs Plaintiff that she is entitled to Social Security benefits commencing November 2009. (Dkt. No. 26, Exh. A.) This is well after Plaintiff filed their final administrative appeal on August 15, 2008. (A.R. 1561–67.) The Sixth Circuit has explained that "such evidence does not fall under the exception to the rule that federal courts can only consider evidence properly presented to the plan administrator when reviewing the reasonableness of an ERISA determination." *Storms v. Aetna Life Ins. Co.*, 156 Fed.Appx. 756, 760 (6th Cir.2005) (affirming district court's decision precluding plaintiff from supplementing the administrative record "with documents demonstrating that [plaintiff] was awarded Social Security benefits[ ] after the closure of the administrative record.").

*Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir.2000) (applying the arbitrary and capricious standard where plan provided that the administrator "shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan"). Because I find no ambiguity in the Plan's grant of discretion, the arbitrary and capricious standard of review is appropriate.[7]

■ "When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000) (internal citations and quotations omitted).

Although the arbitrary and capricious standard has been described as "the least demanding form of judicial review of administrative action," *id.* (citing *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989)), it "is not . . . without some teeth," *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (internal quotation marks and citation omitted). Indeed, a district court applying the arbitrary-and-capricious standard of review does not sit merely to "rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.2004); *see also Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 774–75

(7th Cir.2003) ("Review under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject."). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Evans*, 434 F.3d at 876 (quoting *McDonald*, 347 F.3d at 172).

■ Accordingly, after fully reviewing the administrative record, and considering the quantity and quality of the medical evidence and opinions on both sides, the Court will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir.2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)).

Plaintiff further argues that even if the arbitrary and capricious standard applies in this case, its application should be "shaped" to account for a conflict of interest. (Dkt. No. 25 at 25–26.) The Plan is funded by GM, however, and under the Plan it is clear that Sedgwick that makes the initial eligibility determination and handles the first-level appeal. (*See* A.R. at 26–27.) Because Sedgwick does not dip into its own pocket to pay successful claims under the Plan, Plaintiff has not

---

**7.** Under the Plan, the second-level appeal is decided by GM, and the final appeal is handled by GM's Employee Benefit Plans Committee. (A.R. at 28–29.) Plaintiff does not argue that GM does not have discretionary authority under the Plan. Regardless, it is plain that such an argument would be without merit. Article III, § 3.04(a) states that "[t]he Corporation [GM], as the Program Administrator, shall be responsible for the ad-

ministration of the Program. . . . *The Program Administrator expressly reserves the right to construe, interpret and apply the terms of this Program* . . . . Any interpretation or *determination* made by the Program Administrator . . . *pursuant to such discretionary authority*, shall be given full force and effect, unless it can be shown that the interpretation or determination was *arbitrary and capricious.*" (A.R. at 25–26 (emphases added).)

established an inherent conflict of interest as to Sedgwick.

▮ To the extent that Plaintiff asserts that GM has a conflict of interest when it, or its Employee Benefit Plans Committee, engages in second- and third-level appellate review of a denial-of-benefits claim, this argument has some merit. (*See* Dkt. No. 25 at 25–26.) The Sixth Circuit has instructed that "[w]hen the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir.2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2345, 171 L.Ed.2d 299 (2008)). The mere potential for a conflict of interest does not necessarily trigger a relaxation of the deferential arbitrary and capricious review standard, however. *Lanier v. Metropolitan Life Ins. Co.*, 692 F.Supp.2d 775, 786–87 (E.D.Mich.2010) (citing *Marchetti v. Sun Life Assur. Co. of Canada*, 30 F.Supp.2d 1001, 1007 (M.D.Tenn.1998)). Rather, "in close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Cox*, 585 F.3d at 299. Moreover, "mere allegations of the existence of a structural conflict of interest are not enough for the court to reject a plan administrator's denial of benefits where there is substantial evidence in the administrative record that supports his or her decision; there must be some evidence that the alleged conflict of interest actually affected the plan administrator's decision to deny benefits." *Lanier*, 692 F.Supp.2d at 786–87 (citing *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir.1998)). No such evidence was presented in this case—Plaintiff has done nothing more than point out that GM funds the Plan and sits as a final decision maker of eligibility under the Plan. It is also significant that in all but the final review per-

formed by GM EBPC, the file review and IME doctors, including Drs. Obianwu, Sinha, and Pick, were selected by Sedgwick, which, as mentioned, has no inherent conflict of interest. (A.R. at 2135–36.) Accordingly, I will keep the potential conflict of interest in mind, but it will not be accorded substantial weight, and it will only affect my scrutiny of GM EBPC's decision to deny benefits.

### 2. Defendants' Denial of Extended Disability Benefits Was Arbitrary and Capricious

In connection with the appeal handled by Sedgwick and the second-level appeal to the Plan Administrator, GM, Plaintiff received two denial letters: one on November 20, 2007, the other on June 16, 2008. (*See* A.R. 1070–71, 2256–58.) Together, these letters provide two reasons for discontinuing Plaintiff's benefits after October 23, 2007:(1) the physicians selected by Sedgwick, Drs. Sinha and Pick, concluded that Plaintiff was able to return to work; and (2) Plaintiff had missed a short-noticed IME that was ultimately conducted two weeks later. For the following reasons I find that the Defendants have acted arbitrarily by resting their benefits decision on these two slender reeds.

### a) Defendants' Decision To Credit Independent Medical Consultant Reports Over Plaintiff's Physicians' Reports Was Arbitrary and Capricious

▮ Defendants argue that a decision not to credit "the opinions of Plaintiff's treating physicians over the opinions of several specialists" is neither arbitrary nor capricious. (Dkt. No. 30 at 23; *see also* Dkt. No. 24 at 23–25.) More specifically, Defendants assert that there is nothing arbitrary about favoring the IMEs conducted by Drs. Obianwu and Sinha, as well as the medical file reviews conducted by

Drs. Pick and Bender, over the conclusions of Plaintiff's treating physicians, Drs. Feinstein and Vertkin, and Plaintiff's specialists. Defendants are correct, that as a *general* proposition, "when a plan administrator chooses to rely on the medical opinion of one doctor over that of another ... the plan administrator's decision cannot be said to be arbitrary or capricious." *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir.2003); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."). However, the Supreme Court has also explained that "plan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538 U.S. at 834, 123 S.Ct. 1965. Moreover, the Sixth Circuit Court of Appeals has held that when a plan administrator favors a conclusory independent medical consultant report over the findings of a claimant's treating physician, that decision may properly be considered arbitrary. *See Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 509–10 (6th Cir.2005); *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296–97 (6th Cir.2005).

In *Kalish*, the Sixth Circuit found that a plan administrator acted arbitrarily when it denied benefits based on an independent expert's file review report that was "inadequate in several crucial respects." 419 F.3d at 509–10. The report was faulty in that it concluded that the plan participant could return to a position requiring "light activity" but failed to address his "high-stress" position, and because it ignored the unfavorable observations of the plan administrator's own investigator. *Id.* at 510. Most relevant to the instant case, however, is that the independent expert in *Kalish* made conclusory assertions regarding the participant's ability to return to his former position, and "*fail[ed] to rebut the contrary medical conclusions reached by ... the physician who conducted regular physical examinations of [the plan participant].*" *Id.* Under these circumstances, the Court of Appeals held that the plan administrator arbitrarily and capriciously denied the participant's claim for benefits. *Id.* Similarly, in *Calvert*, the Sixth Circuit found that a file review physician's report was inadequate to uphold the administrator's decision where the record contained contrary "conclusions which [the reviewing physician] never address[ed] head-on and simply seemed to ignore." 409 F.3d at 296–97.

As a point of contrast, in *Fillar v. UNUM Provident Corp.*, the court found that the administrator's decision to favor a file review report was neither arbitrary nor capricious where the file review physician (1) "directly responded to the contrary opinion of" the participant's treating physician, (2) "unequivocally rejected" the treating physician's diagnosis and "thoroughly explained his reasoning for reaching [that] conclusion," and (3) evaluated the results of objective diagnostic testing that led to the treating physician's diagnosis. No. 05–111, 2006 WL 2331184, at *6 (W.D.Mich. Aug. 10, 2006). Similarly, in *Stevers v. United of Omaha Life Ins. Co.*, a case Defendants assert is analogous to the instant case, (*see* Dkt. No. 30 at 24–25), the file review physician's report

> [d]emonstrate[d] that he conducted a thorough review of Plaintiff's entire claims file. He summarized all of Plaintiff's medical records, including Plaintiff's prior medical conditions, and noted numerous inconsistencies between Plaintiff's complaints, the objective evidence, and [Plaintiff's] extremely conservative treatment regimen.

No. 09–11743, 2010 WL 55951, at *10 (E.D.Mich. Jan. 4, 2010). After a thorough review of the independent medical consultant reports in this case, and the medical records Plaintiff submitted in connection with her appeals, I conclude that the reports Sedgwick and GM relied upon to deny benefits are much more akin to the conclusory reports in *Kalish* and *Calvert* than the thorough and well-reasoned reports in *Fillar* and *Stevers.*

Dr. Sinha's IME report reflects that he clearly recognized, but failed to adequately address, objective evidence of Plaintiff's spinal problems. He asserts that he reviewed Blajei's "extensive medical records which extends over a period of several years" and that "[t]he MRI reports *do confirm* the presence of degenerative disc disease at multiple levels, especially C4–C5–C6 with some left neural foraminal narrowing." (A.R. at 1017 (emphasis added).) Dr. Sinha also determined that "the MRI of the lumbosacral spine also *confirmed* the presence of degenerative disc disease, especially at L5–S1 level." (*Id.* (emphasis added).) Further, Dr. Sinha's own conclusion was that "[c]linically, this lady does have symptoms of mild cervical radiculopathy on the right side, most likely with involvement of C5–C6 nerve roots in her neck." (*Id.*) Yet, despite acknowledging Plaintiff's spinal problems, Dr. Sinha never explained why the "confirmed" degenerative disc disease was insufficient to support her claim of disability. Further, Dr. Sinha failed to directly address the contrary opinions of Plaintiff's treating physicians, Drs. Feinstein and Vertkin. In fact, he does not even mention any of their diagnoses in his report. (*See* A.R. at 1015–18.)

It is also significant that Dr. Sinha's initial conclusion was altered at the behest of Sedgwick. In *McDonald v. Western–Southern Life Ins. Co.,* the Sixth Circuit affirmed the district court's decision to give a supplemental independent medical consultant report "very little weight" where the supplemental report was arguably contrary to psychiatrist's initial ambiguous conclusion, and the change was triggered by a telephone call from the plan administrator. 347 F.3d 161, 170–72 (6th Cir.2003). The psychiatrist's initial report in *McDonald* suggested that the plan participant could perform certain functions required by his job, such as relating with co-workers and supervisors and exercising "acceptable judgment concerning work functions." *Id.* at 169. However, the initial conclusion was ambiguous because it also provided that the plan participant "might be able to return to work in a very low stress environment on a limited trial basis." *Id.* As such, the plan administrator informed the psychiatrist that "we were a little uncertain in that towards the end of your letter ... indicates that—or he indicates some hesitancy about his being able to work, or at least that's the way we're reading it and maybe that's not the way you intended it to read." *Id.* at n. 12. In response, the psychiatrist filed a supplemental report where he "was much more forceful in his conclusion that [the plan participant] was able to engage in gainful employment." *Id.* at 171. Under these facts, the Sixth Circuit "agree[d] with the district court that [the psychiatrist's] supplemental report should be discounted." *Id.*

In this case, Dr. Sinha's initial report concluded, "*I think* she *should* be able to return to work, *pending surgery to her neck,* which she is planning to undergo in the near future." (A.R. at 244 (emphasis added).) Only after Sedgwick called Dr. Sinha, and "explained the importance of adhering to contractual language," and that "there cannot be any room for misinterpretation of IMO determinations," did he modify his conclusion to remove the language "I think" and "pending surgery" and unequivocally state that Plaintiff was

immediately able to return to work: "She is able to drive and her job being purely working with computers in a sit-down position, therefore *she is able to return to work.*" (A.R. at 244 (emphasis added).) Because Dr. Sinha's report initial equivocal conclusion was replaced with a "much more forceful ... conclusion" at the prompting of Sedgwick, it is appropriate to discount his report as a rational basis for denying benefits. *See McDonald,* 347 F.3d at 171.

Moreover, Dr. Sinha's conclusion does not appear to be primarily supported by his exam, his medical records review, or his expertise as an orthopedist. Rather, Dr. Sinha appears to have based a significant part of his conclusion on the reasoning that because Plaintiff "is able to drive," "she is able to return to work." (A.R. at 244.) Even assuming that Dr. Sinha's observation that Plaintiff was able to drive is an appropriate basis for concluding that Plaintiff could *sit*, it is quite a leap in logic to conclude that Plaintiff could sit at a computer *for the amount of time required by her job:* 8 hours a day, 5 days a week. In fact, Plaintiff's own treating physicians acknowledged that Plaintiff could sit for up to a half-hour, *(see e.g.,* A.R. at 470–71, 1052), but nevertheless concluded that she could not do her job at GM.

Dr. Pick's May 27, 2008, file review report suffers from similar deficiencies, and is also an irrational basis for denying benefits. First, given the voluminous set of medical records and reports given to Dr. Pick to review—over 500 pages—the fact that the entire substantive portion of Dr. Pick's report is all of three pages plants a seed of doubt as to its completeness and accuracy. *See Kalish,* 419 F.3d at 509 (finding reliance on file review physician's report arbitrary where the "eight-page report ... contain[ed] a six-page summary of [participant's] medical records, but ... dedicate[d] only one page to analyzing

those records."). This seed sprouts when one observes that Dr. Vertkin has "cherry-picked" favorable portions of Plaintiff's medical records and omitted unfavorable reports. *See Stuart v. CVS Corp.,* No. 08–14591, 2010 WL 890181, at *6 & n. 3 (E.D.Mich. Mar. 10, 2010) (finding administrator's decision denying benefits to be arbitrary and capricious where, *inter alia,* file review physician's report was "more of a distortion, rather than a summation, of the medical records" and report indicated that physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding"). One omission is the failure to mention *any* diagnoses by Dr. Feinstein who was Plaintiff's treating physician through April 2006. This is particularly glaring given that Dr. Pick chose to discuss other physician reports taken prior to April 2006 and that Dr. Feinstein found that Plaintiff was disabled from employment on several occasions. (*See* A.R. Supp. 705–06.) With respect to Plaintiff's second treating physician, Dr. Vertkin, Dr. Pick did not do much better. Dr. Pick only mentioned four of Dr. Vertkin's reports and failed to address what appears to be a highly-relevant November 2007 report by Dr. Vertkin suggesting that Plaintiff's condition was worsening:

> The patient presented with a new interpretation of MRI of the neck which was done in February 2007, *which showed that the patient has worsening* from the previous MRI from 2004 that showed C3 and C4 progressive narrowing of bilateral neural foramina C3–C4 and C4–C5 and mild narrowed spinal canal in the level of C5–C6 and C6–C7.

(A.R. Supp. at 383). Dr. Vertkin's "new interpretation" statement is a reference to a November 2, 2007, study by Dr. Aronov that compared a February 2007 MRI of Plaintiff's cervical spine against a December 2004 MRI of the same region. (A.R. Supp. at 411–12.) The study stated that at

Plaintiff's "C4–C5 level ... there is uncovertebral and endplate spurring, resulting in bilateral moderate to *severe* neural foraminal narrowing *which may have progressed* since the previous exam." (*Id.* (emphases added).) Dr. Aronov concluded "[a]s compared to 12/31/04 examination, there is progressive degeneration of the right C3–C4 facet joint and progressive narrowing of bilateral C4–C5 foramina." (*Id.*) Given that Plaintiff was awarded EDB through October 23, 2007, Dr. Pick should have explained why a subsequent study suggesting that her condition had *worsened* was inadequate to support Dr. Vertkin's conclusions regarding ongoing disability.

Dr. Pick also failed to discuss Dr. Xeller's July 2005 diagnoses regarding Plaintiff's cervical spine—despite citing a number of other medical reports from 2005.[8] (*See* A.R. at 1621.) There, Dr. Xeller, a physician selected by Sedgwick to perform an IME, had concluded that Plaintiff's cervical MRI showed "significant compression with some spinal stenosis," and concurred that the condition of Plaintiff's cervical spine made her a candidate for neck fusion. (A.R. at 218.) Dr. Xeller concluded that Plaintiff could only return to work with the restriction of working no more than four hours a day on a computer. (*Id.*) It may be that Plaintiff's condition had improved since Dr. Xeller's exam, but Dr. Pick failed to give an adequate explanation of why that might be the case.

Further, Dr. Pick appears to have at best haphazardly selected, and at worst cherry-picked, a handful of objective reports (MRI, CT, x-ray, EMG, etc. reports) to comment upon. Dr. Pick mentions an August *2005* lumbar x-ray that "has an impressive successful fusion at L5–S 1,"

but does not remark upon a June *2005* cervical MRI which found "[c]ervical spondylosis ... contributing to left greater than right stenosis," (A.R. Supp. at 702–03). Dr. Obianwu, a physician selected by Sedgwick to perform an IME of Plaintiff, reviewed this very MRI and concluded that it "revealed significant cervical spondylosis with involvement of multiple levels." (A.R. at 1647.) Dr. Pick also discusses a medical report by Dr. Friedman which refers to a negative September 2004 EMG for carpal tunnel syndrome, but fails to discuss a cervical MRI taken just three months later which found a C4–C5 disc protrusion "impressing on the ventral nerve root and causing mild flattening of the left lateral cord. It is causing moderate to severe narrowing of the left neural foramen." (A.R. Supp. at 691.) As mentioned, Dr. Pick did not discuss Plaintiff's February 2007 MRI, or the November 2007 study involving that MRI which suggested that Plaintiff's condition was worsening. (A.R. Supp. at 411–12).

Third, of those reports that Dr. Pick did excerpt in his report, he failed to explain why he disagreed with the physician's diagnoses contained therein. *See Calvert*, 409 F.3d at 296–97 (finding that a file review physician's report was inadequate where the record contained "conclusions which [the reviewing physician] never addresses head-on and simply seemed to ignore."). As an example, Dr. Pick's report states that on May 29, 2007, Dr. Vertkin found that Plaintiff suffered from:

1. Neck spondyloarthropathy.
2. Herniated discs at C3–4, C4–5, C5–6, and C6–7.
3. Radiculopathy.
4. L5–S1 disc with artificial disc placement (2005).

---

**8.** Dr. Xeller's report is part of Sedgwick's case notes for Plaintiff's claim. (A.R. at 218.) It appears that these case notes were supplied, or, in any event, should have been

supplied, to Dr. Pick as part of his file review. (*See* A.R. at 1621 (listing approximately 120 pages of case notes).)

5. Chronic pain.

(A.R. at 1623.) Yet, Dr. Pick does not explain why these diagnoses by Dr. Vertkin would not account for Plaintiff's alleged debilitating pain, or in Dr. Pick's words, "extensive subjective symptomatology." (*See* A.R. at 1624.) Nor does Dr. Pick explain why the MRI, CT scan, and EMG reports that favored a finding a disability were inadequate to justify Dr. Vertkin's conclusions. Similarly, Dr. Pick briefly recounts Dr. Higginbotham's report, including Dr. Higginbotham's finding that Plaintiff "has objective evidence of lumbar radiculopathy on the left side," but fails to explain why that objective evidence does not warrant a finding of disability. (*See* A.R. at 1623.)

Fourth, I find it disingenuous that Dr. Pick's conclusion relies in part upon the fact that he received no callback from Dr. Vertkin. (A.R. at 1624 ("*Based on* review of the extensive medical documents provided, *and no callback by the attending physician,* to a reasonable degree of medical certainly [sic], the medical document does not substantiate total disability . . . ." (emphases added)).) On the Friday before Memorial Day weekend, Dr. Pick left Dr. Vertkin a message to call back. Yet, Dr. Pick gave Dr. Vertkin no real opportunity to do so: he submitted his report to Sedgwick the very next business day. (*See* A.R. at 1622.) Defendants rely on *Cooper v. Life Ins. Co. of N. Amer.,* 486 F.3d 157, 168 (6th Cir.2007) for the proposition that an independent medical consultant does not have to "wait indefinitely for a response from a claimant's treating physicians." (Dkt. No. 31 at 6.) While it may be true that an independent medical consultant need not to wait "indefinitely" for a

callback, *Cooper* itself explained that "the examiner does have to wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply." 486 F.3d at 168. Dr. Pick's next-business-day submission was not a "reasonable amount of time" to wait for Dr. Vertkin's response and it was therefore improper for Dr. Pick to rely on Dr. Vertkin's failure to call back as a basis for his conclusion.

In sum, I find that Dr. Sinha's and Dr. Pick's reports are conclusory and fail to adequately discuss, let alone rebut, the diagnoses of Plaintiff's treating physicians. Further, each report is tainted with other indicia of unreliability. Dr. Sinha's report involved a modified conclusion made at the behest of Sedgwick. Moreover, even the conclusion as modified includes the logical leap that because Plaintiff can drive, she can work at a computer for 8 hours per day. Because Dr. Pick's report adopted Dr. Sinha's conclusion by stating that it accurately "reflects the employee's current disability status," it inherited the defects in Dr. Sinha's report. Further, Dr. Pick's report is problematic in its own right given that Dr. Pick cherry-picked favorable medical reports to comment upon and failed to give Dr. Vertkin adequate time to call back and discuss Blajei's diagnoses.

Defendants also argue that the two IMEs performed by Dr. Obianwu support Defendants' decision to terminate benefits. (Dkt. No. 24 at 22–23; Dkt. No. 30 at 22–23.) This argument is a nonstarter. The second of Dr. Obianwu's two IMEs was conducted on October 26, 2006. *A year* later, on October 29, 2007, Sedgwick determined that Plaintiff would be *awarded* EDB through August 3, 2007.[9] (A.R.

9. Plaintiff's EDB were ultimately extended until October 23, 2007. (A.R. at 2136 (letter from GM EBPC explaining that "[o]n October 29, 2007, based on the additional medical provided and a subsequent review of the claim, Sedgwick CMS paid Ms. Blajei's claim . . . through October 23, 2007."); *accord* A.R. at 2258.) This later date was chosen because

1010–11, 1070–71.) It necessarily follows from this grant of EDB that Sedgwick had concluded that Plaintiff was "wholly prevented from engaging in regular employment" within the meaning Plan as of August 3, 2007. Thus, Dr. Obianwu's contrary October 2006 IME report is not a reasonable basis for Defendants to terminate benefits *after* August 2007.

Finally, Defendants argue that a file review conducted by Dr. Bender, the GM Corporate Medical Director, in connection with Plaintiff's final administrative appeal, helps justify Defendants' decision to credit independent medical consultant conclusions over those of Plaintiff's treating physicians. (Dkt. No. 24 at 13, 22–23; Dkt. No. 30 at 23.) The major stumbling block with this argument is that Dr. Bender did not draft a written report of his file review findings. Rather, he merely discussed his findings orally with a GM Employee Benefits and Human Resources employee handling Blajei's claim. (A.R. at 231; Meyers Decl. at ¶ 7.) As such, it is impossible for the Court to find that the substantial deficiencies in the reports of Drs. Sinha and Pick were remedied by the file review of Dr. Bender.

Moreover, notwithstanding the absence of a written report from Dr. Bender, the record suggests that the manner in which GM EBPC handled Plaintiff's final appeal did nothing to cure the arbitrariness of Sedgwick and GM's prior decisions. On October 15, 2008, Jeffery Johnson, Secretary of the GM EBPC, drafted a four-page report to the entire EBPC. (A.R. at 2134–2258.) This "report request[ed] that the Employee Benefit Plans Committee … *review* and make a final determination with respect to an employee appeal." (A.R. at 2134 (emphasis added).) It is

of Plaintiff's "missed" IME on October 24, 2007. (A.R. at 2136, 2258.)

doubtful however, that any meaningful review actually took place: the letter attached none of Plaintiff's medical records, and *on the same day that Johnson drafted the report to the GM EBPC, the GM EBPC drafted a letter to Plaintiff denying her claim.* (A.R. at 2138.) The fact that GM EBPC apparently decided Plaintiff's eligibility by considering only Johnson's letter is further troubling given that the report did not attach the independent consultant reports of Drs. Sinha or Pick. (*See* A.R. at 2134–2258.) Moreover, it is doubtful that anyone on the committee spoke with Dr. Bender. The most plausible inference from the forgoing facts is that the GM EBPC essentially acted as a "committee of one" by giving complete deference to Johnson's four-page report. This inference is strengthened by the inherent conflict of interest that exists because of GM's dual role as Plan Administrator and payor of benefits. *See Cox,* 585 F.3d at 299 ("When the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises.").

Accordingly, I conclude that the Defendants' decision to deny benefits based on the independent medical consultant reports of Drs. Obianwu, Sinha, Pick, and Bender was arbitrary and capricious.

*b) Defendants' Decision To Terminate Extended Disability Benefits Because Plaintiff Missed an Independent Medical Exam Was Arbitrary and Capricious*

■■ Sedgwick, and subsequently GM, also acted arbitrarily in relying on single missed IME as a basis for denying Plaintiff EDB.[10] This basis for denying benefits

10. Notably, Defendants do not even assert that this was a rational basis for denying benefits in their briefing. Accordingly, I will analyze this issue succinctly.

appears in both the November 20, 2007, and June 16, 2008, denial letters. It is true that the Plan provides Sedgwick the authority to interpret and construe the Plan, and that under the Plan

> [Sedgwick] may require an employee, as a condition of eligibility, to submit to examinations by a physician designated by it for the purpose of determining such applicant's initial or continuing disability.

(A.R. at 50–51, 59.) However, an interpretation of this provision that grants Sedgwick the right to terminate benefits on the instant facts is patently unreasonable. *See Kovach v. Zurich American Ins. Co.,* 587 F.3d 323, 328 (6th Cir.2009) ("Under the arbitrary-and-capricious standard, we must uphold the administrator's decision 'if [the administrator's] interpretation of the Plan's provisions is *reasonable.*'" (quoting *Morrison v. Marsh & McLennan Cos.,* 439 F.3d 295, 300 (6th Cir.2006)) (emphasis added)).

In this case, Plaintiff missed a single IME that Sedgwick scheduled on extremely short notice. Sedgwick sent Plaintiff a Fed–Ex regarding the missed IME just two days before it was to take place; this Fed–Ex was left at Plaintiff's door around *2:00 p.m. the day before the exam.* (A.R. at 262, 1008, 1070.) The letter notified Blajei that her exam was in less than 24 hours—at 10:45 the next morning. (A.R. at 1080.) Although Sedgwick also called Plaintiff about the exam, this too was not until the day before the exam. (A.R. at 1070.) These facts suggest that one of three scenarios occurred. Under the first, Sedgwick scheduled the exam well before it was to take place, but then waited until two days before the exam to attempt to inform Plaintiff of it. Under the second, Sedgwick never actually scheduled an exam, but instead sent the Fed–Ex knowing that it was unlikely that Plaintiff would be able to appear a day after receiving notice. The third possibility, and the one

most forgiving to Sedgwick, is that the exam was simply scheduled on extremely short notice: two days. Even under the last of these possibilities, it appears that Defendants were searching for a procedural mechanism, even if unreasonable, that would allow them to deny benefits. Moreover, an IME of Plaintiff was ultimately conducted less than two weeks after the originally-scheduled date. This largely, if not wholly, mitigated any prejudice to Sedgwick and makes their decision to deny benefits on this basis even more unreasonable.

Accordingly, I conclude that the Sedgwick's decision to deny benefits based on the fact that Plaintiff missed a single short-noticed IME was made arbitrarily and with caprice.

### C. *Plaintiff's Due Process Claim*

 Plaintiff also argues that Defendants have violated her due process rights under ERISA because Defendants' denial letters fail to sufficiently address any of her medical records or provide any reasons for rejecting the diagnoses in those records. (*See* Dkt. No. 25 at 26–31.) Defendants respond that while "it may be optimal for a denial letter to describe every detail relating to the denial of disability benefits," such detail is not required under ERISA. (Dkt. No. 31 at 1.) For the following reasons, I conclude that Defendants' denial letters provided inadequate notice to Plaintiff of the reasons why her claim was being denied in violation of ERISA's procedural protections.

ERISA, and its implementing regulations, require that adequate notice be given to each claimant upon termination of benefits, and that the claimant be given a reasonable opportunity for full and fair review by the fiduciary denying the claim. Specifically, under ERISA § 503, 29

U.S.C. § 1133, the plan administrator must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. Further, implementing regulations for Section 1133 provide that "[t]he notification shall set forth, in a manner calculated to be understood by the claimant:"

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. 2560.503–1(g).

The "essential purpose" of Section 1133 is twofold: "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision reviewed by the fiduciary." *Wenner v. Sun Life Assur. Co. of Canada,* 482 F.3d 878, 882 (6th Cir.2007) (citing *Moore v. LaFayette Life Ins. Co.,* 458 F.3d 416, 436 (6th Cir.2006)). The Sixth Circuit has adopted a rule of sub-

stantial compliance with respect to ERISA's procedural requirements. *Moore,* 458 F.3d at 436 (citing *Kent v. United of Omaha Life Ins. Co.,* 96 F.3d 803, 807 (6th Cir.1996)). Under the substantial compliance standard, " '[t]he question is whether [the plan participant] was supplied with a statement of reasons that under the circumstances of the case permitted a sufficiently clear understanding of the administrator's decision [so as] to permit effective review.' " *Id.* (quoting *Brehmer v. Inland Steel Indus. Pension Plan,* 114 F.3d 656, 662 (7th Cir.1997)). Whether the procedure employed by the fiduciary in denying the claim meets the requirements of Section 1133 is a question of law which I review *de novo. Kent,* 96 F.3d at 806 (citing *Bartling v. Fruehauf Corp.,* 29 F.3d 1062, 1069 (6th Cir.1994)).

In the present case, Defendants have not substantially complied with the procedural requirements set out by ERISA § 503. The November 20, 2007, denial letter is deficient in at least two important respects. First, the letter fails to provide *any* reason as to why Dr. Sinha's conclusion was credited over the diagnoses of her treating physicians. *See Love v. National City Corp. Welfare Benefits Plan,* 574 F.3d 392, 396–97 (7th Cir.2009) (finding denial letters were deficient under Section 1133 where "neither letter explained why the reviewer chose to discredit the evaluations and conclusions of [the claimant's] treating physicians"). Rather, as to Dr. Sinha's exam, the letter merely informs Plaintiff that

on November 7, 2007, you underwent an examination by a physician of our designation. The examination was performed by Dr. Sinha, a specialist in Orthopedics. It was determined at this examination that you were able to resume the duties of your occupation. On this basis, full payment of this claim for disability will remain payable thru August 3, 2007,

pending submission of additional medical certification.

(A.R. at 1071.) Although the above excerpt tells Plaintiff that her benefits were denied because of Dr. Sinha's IME, it begs the critical question of *why* Dr. Sinha's IME was being credited over her physician's contrary diagnoses. *See Clark v. Metropolitan Life Ins. Co.,* 67 F.3d 299, 1995 WL 592102, at *3 (6th Cir.1995) (table disposition) (finding that letter informing claimant that benefits were denied because the claimant's condition was preexisting did not provide a reason but merely a conclusion; "[t]he *conclusion* that his conditions were pre-existing is not a *reason* why [the administrator] believes they were pre-existing."). Although Defendants argue that Plaintiff was provided a copy of Dr. Sinha's report, as discussed in Part II.B.2 *supra,* this report does not attempt to rebut her physician's findings regarding disability nor does it adequately discuss her physician's findings. As such, Plaintiff could not determine what medical information should be submitted on appeal to tilt the scales in favor of her physician's diagnoses.

Second, while the November 2007 letter informs Plaintiff that benefits would be discontinued "pending submission of additional medical certification," it does not instruct Plaintiff as to what type of "additional medical certification" would suffice. *See* 29 C.F.R. § 2560.503–1(g)(1)(iii) (requiring a denial notification to set forth "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"); *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 691 (7th Cir.1992) ("Clearly, a blanket request for 'additional medical information' would not have satisfied the regulatory requirements [set forth by 29 C.F.R. 2560.503–1].... [W]e [have previously] held that to satisfy the requirement of a description of any additional material

or information necessary for the claimant to perfect the claim, [a denial] letter would have to specify the kind of additional medical information needed."). Indeed, Article III, § 3.05(b) of the Plan recognizes a duty to inform Plaintiff of what type of additional information would be helpful on appeal:

[A denial] notice will include *specific reasons* for the denial and will refer to the plan provisions upon which the denial is based. *The notice will also include a description of any additional information that may be needed if the claim is to be resubmitted* and an explanation of the procedure to be followed to have the claim reviewed if the claim has been denied.

(A.R. at 26 (emphases added).) Contrary to Section 1133, its implementing regulations, and the Plan itself, Sedgwick failed to inform Plaintiff of what type of "additional medical certification" it desired. Plaintiff was thus at a loss as to what to submit on appeal and at therefore could not obtain the "full and fair" review contemplated by ERISA.

A similar analysis applies to GM's June 16, 2008, denial letter. At first blush this letter appears considerably more detailed than Sedgwick's November 2007 letter. However, upon closer inspection it is clear that the extra "detail" is merely a recitation of the procedural history of Plaintiff's claim. (*See* A.R. at 2256–57.) In regards to the actual basis for denying benefits after October 23, 2007, the extent of the letter is that "there has been no medical evidence provided that would allow us to overlook Ms. Blajei's failure to report for the October 24, 2007, [IME] or the results of the November 7, 2007, examination." (A.R. at 2258.) Thus, the June 2008 letter, like the November 2007 letter, fails to make any mention of (1) the medical records submitted by Plaintiff in support of her claim, (2) her treating physicians' diag-

noses, (3) what type of additional medical information should be submitted on appeal, or (4) why the conclusions of Drs. Sinha and Pick were being credited over her treating physician's finding of disability. (*See* A.R. at 2256–57.) As such, it does nothing to fill the deficiencies of the November 2007 letter.

Finally, it is unnecessary to explain at any length why the October 15, 2008, denial letter fails to cure any of the defects in the prior denial letters. Omitting salutations and closings, the entirety of the letter is as follows:

> This is to advise you that on October 15, 2008, the [GM EBPC] reviewed your appeal for [EDB] under the [Plan].
> It is the decision of the EBPC to uphold the Plan Administrator's position that the denial of [EDB] is appropriate.

(A.R. at 2259.) Plainly the letter fails to provide Plaintiff with any information beyond the fact that her benefits appeal had been denied.

Defendants are correct that Section 1133 does not require a denial letter to describe every detail relating to the decision to deny benefits; however, a letter completely devoid of any discussion of a claimant's medical evidence submitted to support disability, or why an IME physician's conclusions were being favored over a claimant's physician's conclusions, does not comport with ERISA's procedural requirements. *See Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) ("A plan administrator need not … annotate every paragraph of a thousand-page medical record…. But a plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted…."). Accordingly, after considering the communications between Plaintiff and Defendants as a whole, I conclude that Plaintiff " 'was [not] supplied with a statement of reasons that

under the circumstances of the case permitted a sufficiently clear understanding of the administrator's decision [so as] to permit effective review,' " *Moore*, 458 F.3d at 436 (quoting *Kent*, 96 F.3d at 807), and therefore Defendants have violated the notification requirements set forth by Section 1133.

### D. The Appropriate Remedy

■ The only remaining issue is to decide whether to award EDB to Plaintiff or remand this case for full and fair review. *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir.2006) (" 'There is no question that this court has the power to remand to the claims administrator; it also has the power, in appropriate cases, to award benefits to the disability claimant.' ") (quoting *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1st Cir.2005)). Where there has been a problem in a plan administrator's decision making process, but it is not clear that the plan participant is entitled to benefits, the appropriate remedy is to remand. *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 396 (6th Cir.2009) (remanding to plan administrator where "the integrity of the decision-making process ha[d] certainly been questioned" but "it does not appear that claimant is *clearly* entitled to benefits."); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622–23 (6th Cir.2006) ("[W]e cannot say that [the plan participant] is clearly entitled to benefits…. Thus, we believe that a remand to the district court with instructions to remand to [the plan administrator] for a full and fair inquiry is the proper remedy here.").

In this case, I cannot say that Plaintiff is "clearly entitled" to benefits so as to warrant an immediate grant of EDB. As Defendants point out, the record contains reports of objective tests, performed by Plaintiff's own physicians, that suggest she

may be able to engage in sedentary employment. (Dkt. No. 25 at 9–12.) For example, in November 2005, Dr. Kurz reviewed a cervical MRI and concluded that "I do not see any spinal cord compression or any large disc herniation." (A.R. Supp. at 387.) A July 19, 2006, report by Dr. Eilender states that "[b]asically, [Blajei's] EMGs of both upper extremities and both lower extremities are now completely within normal limits, with no evidence of any pinched nerves, or anything that is abnormal." (A.R. 373–34.) Similarly, a December 5, 2006, report by Dr. Kole provides "I really don't see a neurological abnormality . . . At the present time the neuro exam is not remarkable and nerve conductions and EMG are not remarkable." (A.R. at 376–77.)

Although these tests might suggest that Plaintiff is not disabled from employment under the Plan, it is not appropriate for a court to address them in the first instance, and, further, the tests do not change the fact that the "integrity of the plan's decision-making process" was compromised in this case.[11] *See Elliott,* 473 F.3d at 622 (holding that remand to plan administrator appropriate and noting, "We are not medical specialists and [the disability] judgment is not ours to make."). As discussed at length, there were at least two significant problems in the way Plaintiff's claim was handled: (1) Sedgwick and GM's decision to favor conclusory independent consultant reports over Plaintiff's physician's diagnoses; and (2) Sedgwick and GM's failure to (a) adequately provide Plaintiff with the reasons for its denial of benefits, and (b) give some instruction as to the type of

medical information needed to proceed on appeal. Accordingly, it is proper to remand this case.

On remand, Defendants should detail non-arbitrary reasons for denying benefits, consistent with this Opinion.[12] Defendants may, but are not order to, request another IME of Plaintiff or ask a physician to conduct another file review. After Plaintiff has had an opportunity to submit additional relevant medical evidence, Defendants should thoroughly examine Plaintiff's file and, after a full and fair inquiry, clearly explain all reasons for its benefits decision.

### III. Conclusion

For the forgoing reasons, it is ORDERED that Defendants' Motion to Strike (Dkt. No. 26) is GRANTED. It is further ORDERED that Defendants' Motion to Affirm the Administrator's Decision Regarding Plaintiff's Claim for Extended Disability Benefits (Dkt. No. 24) is DENIED and that Plaintiff's Cross Motion For Judgment to reverse administrator's denial of Extended Disability Benefits (Dkt. No. 25) is GRANTED IN PART. This matter is REMANDED for a full and fair review.

**IT IS SO ORDERED.**

---

11. In fact, none of the three test reports just referenced were mentioned in the reports of Drs. Sinha or Pick, or in any of the denial letters sent to Plaintiff.

12. As noted in my analysis of Defendants' Motion to Strike, Part II.A *supra,* the Social Security Administration determined that

Plaintiff was entitled to disability benefits after final administrative review of Plaintiff's claim for EDB was complete. The SSA's findings were therefore not part of the administrative record previously reviewed by Sedgwick or GM. The SSA's determination should, however, be considered on remand.