NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0650n.06

No. 14-2188

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| VICKI KONING, | ) | **FILED**<br>Sep 24, 2015<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) |  |
| Plaintiff – Appellant, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| UNITED OF OMAHA LIFE INSURANCE | ) | THE WESTERN DISTRICT OF |
| COMPANY, | ) | MICHIGAN |
|  | ) |  |
| Defendant – Appellee. | ) |  |
|  | ) | OPINION |

Before: ROGERS and McKEAGUE, Circuit Judges; SARGUS, District Judge[*]

SARGUS, District Judge.  Plaintiff Vicki Koning sued defendant United of Omaha Life Insurance Company ("the Plan"), alleging that the Plan denied her claim for long-term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(a)(1)(B), ("ERISA").  The district court granted summary judgment to the Plan, finding the Plan had properly denied Koning benefits.  Because the Plan did not properly consider Koning's appeal in the first instance, we remand to the district court with instructions to

---

[*] The Honorable Edmund A. Sargus, Jr., Chief United States District Judge for the Southern District of Ohio, sitting by designation.

remand to the Plan for appropriate consideration of Koning's claim in accordance with this opinion.[1]

## I.    BACKGROUND

Koning is a 53-year-old woman who was employed as the Human Resources Manager for American Metal & Plastics, Inc., in Grand Rapids, Michigan, until she stopped working as a result of chronic neck and back pain. Koning was covered under the Plan, which served as the provider of group long term disability insurance for American Metal & Plastics, Inc. ("American").

### A. Medical History

The administrative record shows that Koning's leg and back pain began in 1999, and despite progressive treatments including anti-inflammatory medications, courses of physical therapy, nerve-blocks, and spinal surgeries, her back pain ultimately was not resolved, and in time she also experienced neck pain of her cervical spine in addition to lumbar back pain. A recitation of her medical issues follows.

In 1999, while in her late thirties, Ms. Koning was a hairdresser, and owned a beauty shop. She underwent spine surgery on her lower back in 2002.[2] In June, 2004, she was referred to Dr. John Ehlert, an orthopaedic and spinal surgeon, for a spinal consultation "regarding problems of lower back pain and bilateral, right greater than left, leg pain." After examining her MRI scan, Dr. Ehlert opined that she had a herniated L4-5 disc, and a herniation of the L5-S1disc. He explained various treatment options, and she started with a non-surgical treatment option, taking a high-dose anti-inflammatory medication and stopping physical therapy. Dr.

---

[1] We do not address or resolve defendant's pre-existing conditions defense raised by the Plan below but not addressed by the district court.

[2] The record does not clearly establish the precise date or nature of the procedure.

Ehlert explained that "she has a degenerative disc at this level and another below and with a central disc herniation the risk of recurrent disc herniation is higher and there are long term complications." He recommended a Medrol Dose Pak followed up by Celebrex, and then a re-evaluation. If the medication did not help, he recommended an epidural, and if those treatments failed, her recommended surgical intervention. (R. 13-3, PageID 151-53).

On September 24, 2004, Ms. Koning was referred to the Holland Community Hospital Pain Management Center for a consultation with Dr. Keith Javery, regarding "a 4-year history of persistent back pain, frequent lower extremity pain, right worse than left, down the lower extremities as well as neck pain and right arm pain." (R. 13-5, PageID 403). Dr. Javery noted that she "demonstrated significant range of motion difficulties both actively and passively. She had positive facet provocative testing throughout the neck at C3 to C7 and throughout the lumbar spine at L2 to L5 bilaterally." He was able to reproduce her chief complaint with "disc loading maneuvers," and then administered an epidural treatment to her spine. Because the "disc provocative testing" remained "quite positive" he suggested continuation of the epidural injection therapy. The second treatment was not as successful in treating her pain. Dr. Javery referred her to Dr. Lowry for a surgical consultation. Dr. Lowry was not in her insurance group, and her insurance company directed her to Dr. Jurgen Luders. (R. 13-5, Page ID 404-410).

On January 25, 2005, at age 42, Ms. Koning had surgery for her herniated discs. Dr. Luders performed a lumbar laminectomy.[3] He found that "[i]maging demonstrated a very large

---

[3] The Mayo Clinic discusses the effect of a laminectomy:

> Most people report measurable improvement in their symptoms after laminectomy, but the benefit may lessen over time as the spine continues to age or if there is a recurrence of arthritis. Laminectomy is more likely to improve leg pain caused by a compressed nerve than back pain. Because laminectomy can't

L4-5 central herniated disk causing significant compression of the thecal sac and a left paracentral L5-S1 herniated disk." Dr. Luders removed "a very large disk fragment" at the L4-5 level. "A diskectomy was performed on the left side at L5-S1 in the same manner." (R. 13-2, PageID 167). The surgery provided relief, and Ms. Koning returned to work. On August 18, 2005, she returned to Dr. Luders for a follow-up visit, and for pain radiating up into the area above her right ear. Dr. Luders performed a nerve block in the office. (R. 13-5, PageID 359). Ms. Koning found she could no longer be on her feet as a hairdresser, and she modified her position to manager of the salon. Ultimately, on December 16, 2006, Ms. Koning took a position as the Human Resources Manager at American Metal & Plastics. From 2006 through 2012, Ms. Koning performed her job as Human Resources Manager. On July 10, 2012, she stopped working due to back pain and physical limitations and began receiving short term disability benefits.

### B.     Dr. Fitzgerald's medical opinion of disability

From 1999, when Koning was in her late thirties, to 2013, when Koning was in her early fifties, her pain continued to require management, her back condition continued to deteriorate, and she began to experience neck pain. From 2004 on, she was treated at the Holland Community Hospital Pain Management Center by Dr. Keith Javery, and then by his partner, Dr. Kevin Fitzgerald. After years of increased pain and physical limitations, she was ultimately deemed disabled by her treating physician, Dr. Kevin Fitzgerald.

She applied for short-term disability benefits, which United paid up to January 11, 2013. On January 31, 2013, Dr. Fitzgerald completed a "Physician's Statement" indicating a primary

---

stop the buildup from osteoarthritis that caused the nerve compression in the first place from happening again, symptoms may come back over time.

*See* www.mayoclinic.org/tests.../**laminectomy**/.../**results**/prc-2000

diagnosis of lumbar radiculopathy, with symptoms of back and lower extremity pain, based on the objective findings of "disc degeneration and bulging discs" with a secondary contributing condition of lumbar degenerative disc disease and lumbar spondylosis. He restricted her from all work through March 11, 2013, when she would be re-evaluated. (R. 17-1, Page ID 1224). On April 15, 2013, the Plan denied Ms. Koning's claim, stating in its letter of denial that the medical documentation on file "does not support restrictions and limitations that would preclude you from performing the material duties of your regular occupation as a human resources manager." (R. 15-2, PageID 701).

Meanwhile, Dr. Fitzgerald ordered a functional capacity evaluation (FCE), which was performed by a physical therapist on April 3, 2013. (R. 15-2, PageID 728 through R. 15-3, PageID 764). The physical therapist used the Physical Demand Characteristics of Work chart, Light (PDL) to evaluate her ability to do her predominantly sedentary office job,[4] opining that Koning's "tolerance for dynamic sitting is 30 minutes, dynamic standing 10 minutes/standing 5 minutes and walking 10 minutes, sitting with ability to change positions as needed and walking at her own pace." (R. 15-2, PageID 733). In his General Neurological Comments, he noted that Ms. Koning had "Wide spread pain, poor tensed posture, muscle tension and fatigue, restricted ROM [range of motion], diffuse right sided weakness, disturbed gait, chronic headaches, de-conditioning, poor tolerance to ADLs [activities of daily living]." (R. 15-3, PageID 757). He also posited that "[p]ossible fear of re-injury may be affecting the test results." (R. 15-3, PageID 757).

---

[4] "Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." (R. 15-4, PageID 840).

**C. Disability Plan**

The Plan provides for an initial 180-day "elimination period" during which LTD benefits will not be paid to a disabled person under the policy. During the elimination period, American is self-funded for short-term disability benefits and pays them on a weekly basis. American paid short-term disability payments to Koning in their available entirety up until January 11, 2013. After the short-term disability benefits run out, an employee may be eligible for LTD benefits. To be eligible for such benefits, an employee must have, because of "an injury or sickness, a significant change in . . . mental or physical functional capacity" such that she is "prevented from performing at least one of the material duties of [her] regular occupation on a part-time or full-time basis . . . ." (R. 13-1, PageID 73). After a benefit has been paid for 24 months, the definition of "disability and disabled" means "you are unable to perform all of the material duties of any gainful occupation. Disability is determined relative to your ability or inability to work. It is not determined by the availability of a suitable position with your employer." (*Id.*).

The Plan reads as follows:

> **Definition of Disability:** Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

> - Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

> - Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

> After a Monthly Benefit has been paid for 24 months, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation. Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with your employer.

(RE 13-1, Page ID # 73).

6

The Plan may "sometimes require that a claimant be examined by a Physician or vocational rehabilitation expert of our choice," but will "not require more than a reasonable number of examinations." (*Id.*, at PageID 96). The Plan provides for an "Initial Claims Decision" by the Plan, and an administrative appeal to the Plan from an "Adverse Benefit Determination." (R. 13-1, PageID 97-99). In deciding an appeal based on a "medical judgment," consultation will be made with "a health care professional" with "appropriate training in the field of medicine involved" in the judgment. (*Id.*, at PageID 99).

### D. Short-Term Disability Benefits

Ms. Koning applied to the Plan for short-term disability benefits after she was determined by her physician, Dr. Kevin Fitzgerald, a board-certified anesthesiologist, to be medically unable to work.[5] Her last day worked was July 10, 2012, and she was granted benefits up to January 11, 2013. (R. 16-2, PageID 1168). When these benefits expired, Koning applied for LTD benefits, and included in her application a "Physician's Statement" from Dr. Fitzgerald, placing her "off work" through "3-11-13" and with a "prognosis for recovery" of "unknown – will evaluate next appointment." (R. 17, PageID 1223-24). Her employer, American, confirmed to the Plan that Koning was off work on "doctor's orders." (R. 17, PageID 1227-28). In its "Long-Term Disability Claim Employer's Statement," American stated that Ms. Koning had been "given remote access and worked from home sometimes" in answer to the question of whether there were "any changes to the employee's job responsibilities due to the disabling condition before the employee became fully disabled." In response to the question of "[h]ow long will the employee's job be held open?" the response was "no time – position must be filled

---

[5] The administrative record ("R.") is filed under seal, and consists of R. 13 (Page ID 59-414); R. 14 (Page ID 415-623); R. 15 (Page ID 624-904); R. 16 (Page ID 905-1214); and R. 17 (Page ID 1215-1257).

immediately." (R. 17-1, PageID 1226-27). Ms. Koning's employment was terminated when her short-term disability ended on January 18, 2013. (R. 16-5, Page ID 1187).

### E.  Long-Term Disability Benefits

When her short-term disability benefits expired, Koning filed with the Plan all of the documents necessary to perfect her application for LTD benefits under the Policy, including the "Long-Term Disability Claim Physician's Statement" signed by Dr. Fitzgerald on January 31, 2013, (R. 17-1, PageID 1223-1224); the "Long-Term Disability Claim Employer's Statement" and "Job Analysis" signed by American's representative on January 16, 2013, (R. 17-1, PageID 1226-1228); the "Long-Term Disability Claim Employee's Statement" signed by Koning on January 18, 2013, (R. 17-1, PageID 1230-1231); and hundreds of pages of medical records detailing back surgeries, physical therapy, and numerous pain treatment programs. On April 15, 2013, a member of the Plan's "Group Insurance Claims Management," wrote to Koning advising her "we have determined that we are unable to approve benefits and your claim has been denied." (R. 15, PageID 694-703). The letter based the denial primarily on a "review" by an unnamed "Medical Consultant" performed March 6 and March 19, 2013, and an "Occupational Analysis" by an unnamed "Vocational Rehabilitation Consultant," leading the Plan to conclude that "the medical documentation on file does not support restrictions and limitations that would preclude you from performing the Material Duties of your Regular Occupation as a human resources manager." (R. 15, PageID 701).

The Plan obtained the review from employees at "University Disability Consortium," a commercial entity in Massachusetts. The "Occupational Analysis" was performed by an employee with a Master's of Science degree. Her brief report made no reference to Koning's particular medical conditions, and did not explain what part of Koning's treating physician's

professional medical opinion was discredited, and why. She conceded that she did not examine or meet Koning personally. (R. 14, PageID 542-544). Similarly, the "Medical Record Review" by the same commercial group was performed by a registered nurse with a Bachelor's of Science and nursing degree, who also did not examine or meet Koning personally. She reached the conclusion that the "medical records available for review fail to support any restrictions or limitations from a sedentary demand level," and that "[n]o impairments are supported." (R. 15-5, PageID 854-863). Again, the report does not explain what part of Koning's treating physician's professional medical opinion was discredited, and why. The denial letter advised that Koning could direct a written appeal to the Plan within 180 days. The appeal policy states:

> ### APPEALS OF ADVERSE BENEFIT DETERMINATIONS
>
> You may appeal within 180 days following Your receipt of notification of an Adverse Benefit Determination.
> . . .
> You will have the opportunity to submit written comments, documents, records, and other information relating to the claim.
> . . .
> Our review will not give deference to the initial Adverse Benefit Determination.
> . . .
> In deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, *the individual conducting the appeal will consult with a health care professional:*
>
> (a) *who has appropriate training and experience in the field of medicine involved in the medical judgment;* and
>
> (b) who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual.

(R. 13-1, PageID 99) (*emphasis supplied*).

Koning obtained counsel, and in her appeal, attached again several hundred pages of her medical records, dating from 2004. Included in the submission was an updated "Physician Statement of Disability" by Koning's treating anesthesiologist, Dr. Fitzgerald, confirming his

medical judgment that he "continue[s] to keep Mrs. Koning off work," and continues in his "medical judgment" to consider her "disabled from her regular occupation as a Human Resources Manager and any other full-time occupation at this time." Dr. Fitzgerald's updated medical opinion reported the following:

PHYSICIAN STATEMENT OF DISABILITY

1.  My name is Kevin Fitzgerald. I am a Medical Doctor licensed by the State of Michigan, Certified in Anesthesiology with a primary specialty in Pain Management.

2.  My address is Michigan Pain Consultants, 2147 Health Drive, Wyoming, Michigan 49519.

3.  Vicki Koning is a long standing patient of Michigan Pain Consultants. Prior to my treatment, Mrs. Koning was a patient of my former partner, Keith Javery, D.O.

4.  Mrs. Koning has been diagnosed with the following neck and back conditions for which I provide pain management:

    - Spinal stenosis
    - Degenerative disc disease L3-4, L4-5, L5-S1
    - Degenerative disc disease C4-5, C5-6
    - Post laminectomy pain syndrome
    - Lumbar spondylosis with radicullitis
    - Lumbosacral spondylosis
    - Cervical spondylosis with radiculitis
    - C7-8 radiculopathy
    - Large central disc protrusion L4-5
    - Disc Bulge L5-S1
    - Bilateral L5 radicular syndrome
    - Lumbar canal stenosis C4-5
    - Spondylosis C2-3, C4-5, C5-6
    - Chronic cervicalgia due to facet arthropathy at the 4th, 5th and 5th cervical segments;
    - Cervicogenic headaches.

5.  It is my understanding that Mrs. Koning underwent spine surgery in 2002; followed by a lumbar laminectomy and discectomy at L4-5 on January 25, 2005; and a right posterior cervical lymph node excision on August 12, 2005. Despite surgical intervention, courses of physical therapy, epidural injections, cervical

facet injections, nerve root block and rhizotomies, Mrs. Koning continues to experience:

- Chronic and severe back pain;
- Chronic and severe neck pain;
- Bilateral lower extremity pain;
- Bilateral shoulder and arm pain;
- Pain that radiates into her back buttocks and legs;
- Inability to sleep due to her physical pain.
- Unable to sit, stand and/or bend for any significant period of time.

6. As a result of her medical conditions, I agreed that Mrs. Koning should discontinue working as a Human Resources Manager for American Metal & Plastics and I understand her last day worked was on July 10, 2012.

7. In accordance with her employment, I am aware that Mrs. Koning applied for long term disability benefits the United of Omaha Insurance Company, which were denied on April 15, 2013, on the basis of a functional capacities evaluation (which I ordered) by Sakari Perttula, P.T.

8. I have reviewed Mr. Perttula's functional capacities evaluation report as well as the United of Omaha's April 15th correspondence.

9. I have considered Mr. Perttula's findings and conclusions and continue to keep Mrs. Koning off work.

10. It is my medical opinion that Vicki Koning is disabled from her regular occupation as a Human Resources Manager and any other full-time occupation at this time.

( RE 13-2, Page ID # 158 - 159).

The doctor also attested that, to the extent that the Plan based any of its denial on the functional

capacity examination of Koning conducted by a physical therapist pursuant to his orders, he

disagreed with the Plan's interpretation of the examination findings. (R. 13, PageID 158-159).

In response to Koning's appeal, the Plan again did not engage a physician to assess Dr.

Fitzgerald's opinion, despite the Plan's provision that:

In deciding an appeal of any Adverse Benefit Determination that is based in whole or in part on a medical judgment, *the individual conducting the appeal will consult with a health care professional:*

> (c) *who has appropriate training and experience in the field of medicine involved in the medical judgment . . . .*

(R. 13-1, PageID 99) (*emphasis supplied*).

At no time did the Plan consult a board-certified pain management doctor. Rather, the evidence in the record shows that the Plan sent medical records to a "nurse case manager" with the following instructions:

> Please review and identify any restrictions and limitations supported by the documentation in [sic] file, with the understanding if something is not listed as a restriction or limitation, they would be capable of performing the function.
>
> Does the indicated activity level appear to be in accordance with the documentation in the file? Please indicate how it does or does not.
>
> Please provide any guidelines concerning the time frame to update medical records. For instance, should medical records be updated every month, every three months or is this a condition that would require an update in four to six months?

(R. 17-1, PageID 1247-1252).

The nurse reviewed documents in the file, and reported that, in her "Medical Analysis""[t]here was no observable change in the CH's physical status from a spine or pain standpoint from prior to last day worked to current available notes." She asserts:

> Exams have revealed no loss of strength, ambulation assistance or neurological deficits. She consistently appears in no acute distress with stable vital signs, which is not reflective of significant pain causing a systemic issue. The CH present unaccompanied at visits signifying she is driving and transferring independently. The FCE on 4/03/13 determined the CH's perception of her capacity of functioning is lower than what she is capable of performing. It was suggested she could perform at the "light" physical capacity level.
> · · ·
> In my opinion the CH would be precluded from lifting/carrying > 20 pounds, repetitive bending and twisting at the waist. She would require the ability to make routine position change every 1-hour for 5 minutes or the use of a sit-to-stand work station to change position at will.

Id. at 1250.

The "Medical Analysis" was prepared without ever examining Koning, or consulting with her physician, a board certified pain management doctor. Having no independent knowledge, the nurse, for example, could have no idea how far Koning had driven for the appointment or whether she was, in fact, in acute pain.

## II. STANDARD OF REVIEW

The *de novo* standard of review was employed by the district court, and is the appropriate standard of review on appeal. The Sixth Circuit set forth the standard of review in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 2005):[6]

> The standards of review for determining ERISA denial-of-benefits claims are well-established. *See Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *see also Rowan*, 119 F.3d at 435. In cases in which a plan administrator is given no discretionary authority by the plan, review of the plan administrator's decision by the district court—as well as the court of appeals—is *de novo,* with respect to both the plan administrator's interpretation of the plan and the plan administrator's factual findings. *See Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Rowan,* 119 F.3d at 435.[4] When conducting a *de novo* review, the district court must take a "fresh look" at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator. *See Perry* 900 F.2d at 966; *see also Rowan,* 119 F.3d at 437.[7]

*Id.* at 618.

## II. ANALYSIS

### A. Merits

After reviewing the record, we conclude that the Plan failed to adequately evaluate the evidence presented. The Plan ignored favorable evidence submitted by her treating physician(s),

---

[6] As of March 1, 2007, Michigan law prohibits policies containing discretionary authority clauses that would trigger the arbitrary and capricious standard of review, MICH. ADMIN. CODE R. 500.2201-02 (2011), and this Court has upheld the provision. *See Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009) (the Michigan rules fall within the ambit of ERISA's savings clause and are not preempted by ERISA).

[7] *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Rowan v. Unum Life Ins. Co.,* 119 F.3d 433 (6th Cir.1997); *Perry v. Simplicity Engineering,* 900 F.2d 963 (6th Cir.1990).

selectively reviewed the evidence it did consider from the treating physicians, failed to conduct its own physical examination, and heavily relied on non-treating nurses and other non-physicians.

### 1. Ignoring Favorable Evidence from Koning's Treating Physicians

"[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). However, they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. at 834. "[A] plan may not reject summarily opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, __F.3d__, 2015 WL 4548232 (6th Cir July 29, 2015), Op. 13, citing *Elliott v. Metro. Life Ins. Co*., 473 F.3d 613, 620 (6th Cir. 2006). In *Shaw*, this Court found that the Plan acted arbitrarily and capriciously where a claimant's medical records and functional capacity evaluation showed that he was unable to sit or stand for more than 30 minutes, and had to lie down to recuperate. The Court explained that a Plan cannot ignore favorable evidence from a treating physician, but must "'give reasons" for rejecting a treating physician's conclusions'". *Id*., citing *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 608-09 (6th Cir. 2014) (finding that the plan acted arbitrarily and capriciously in denying benefits for a mental disorder in part because the plan failed to "'give reasons' for rejecting a treating physician's conclusions.").

Here, as in *Shaw*, the Plan ignored favorable evidence from Koning's treating physicians. In rejecting Koning's claim for LTD benefits, the Plan stated "the medical documentation in the file does not support restrictions and limitations that would preclude you from performing the

Material Duties of your Regular Occupation as a human resources manager." (R. 15, PageID

701). Specifically, the Plan based its denial on the findings of the records reviewer, stating that:

> Ms. Koning's occupation as a Human Resources Manager is a sedentary strength
> occupation. A sedentary strength occupation requires Ms. Koning to exert up to
> 10 lbs. of force occasionally and or negligible amount of force frequently to lift,
> carry, push, pull, or otherwise move objects.
>
> …
>
> [A]fter submitting Ms. Koning's file for a medical review, we believe that
> although Ms. Koning's MRI results have revealed mild discogenic degenerative
> change at the C4-5 and C5-6 levels, the examinations have demonstrated no loss
> of strength, ambulation assistance or neurological deficits. Ms. Koning was
> constantly noted to be in no acute distress with stable vital signs, which is not
> reflective of significant pain causing a systemic issue. Additionally, the FCE that
> was completed on April 3, 2013, indicated Ms. Koning could perform in the light
> physical capacity level. Therefore, Ms. Koning would not be restricted from
> performing her sedentary strength occupation as a Human Resources Manager.

(R. 13-2, PageID 135-137).

This brief analysis does not address Dr. Fitzgerald's medical opinion that Koning has "chronic

and severe back pain; chronic and severe neck pain; bilateral lower extremity pain; bilateral

shoulder and arm pain; pain that radiates into her back, buttocks, and legs; inability to sleep due

to her physical pain; and [is] unable to sit, stand and/or bend for any significant period of time."

(R. 13-2, PageID 158). The Plan cites no medical evidence in conflict with Dr. Fitzgerald's

conclusions.

Additionally, the cited FCE used the Physical Demand Characteristics of Work chart,

Light (PDL) to evaluate Koning's ability to do her predominantly sedentary office job, and the

therapist found that she could not sit for more than 30 minutes at a time, and had "[w]ide spread

pain, poor tensed posture, muscle tension and fatigue, restricted ROM [range of motion], diffuse

right sided weakness, disturbed gait, chronic headaches, de-conditioning, poor tolerance to ADLs

[activities of daily living]." (R. 15-2, PageID 733; R.15-3, PageID 757). These conclusions are

also at odds with the Plan's statement that Koning's "examinations have demonstrated no loss of

strength." (R. 13-2, PageID 135-137). The Plan simply contradicts the medical findings without explaining why, and without offering any evidence to contradict these medical observations, even though a functional capacity evaluation "is generally a reliable and objective method of gauging the extent one can complete work-related tasks." *Shaw*, __F.3d, 2105 WL 4548232, at *8. This is particularly unconvincing in light of the fact that Dr. Fitzgerald specifically stated that he had considered the findings and conclusions of the FCE in determining that Koning cannot perform any full-time occupation at this time. Instead of offering adequate medical evidence to rebut Dr. Fitzgerald's opinions, the Plan's non-physician file reviewers simply concluded that Koning could perform sedentary work.

## 2. *Selectively Reviewing Treating Physician Evidence*

This Court has held that a plan administrator acts arbitrarily and capriciously when it "engages in a selective review of the administrative record to justify a decision to terminate coverage." *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (internal quotation marks omitted). Here, the Plan's file reviewers engaged in a selective review when they concluded that Koning was not disabled, without adequate medical evidence to refute her treating physician's diagnoses. The records review specifically discounts her pain.

For example, a review of one of her physical therapy notes would show that her cervical range of motion is "restricted." Her therapist reported "Flexion: 35 degrees/pain on the right; Extension: 30 degrees/pain on the right; Rotation (left): 50 degrees/pain on the right; Rotation (right): 50 degrees/pain on the right. Palpation and tenderness was found right neck and upper back. Mobility testing reveals hypo mobility at OA and upper thoracic. Ms. Koning reports the pain being related to turning." "She has not achieved the set goals of decreased pain and

irritation and functional ROM." (R. 16-2, PageID 1038). However, the nurse reviewing the medical records for the Plan states in her "Medical Analysis":

> The claimant has numerous somatic[8] reports of pain that is [sic] in excess of physical or diagnostic findings. While there is note of the claimant having cervical lumbar pain, there is no current documented diagnostic testing, such as demonstrating subulaxation, MRI or CT, demonstrating spinal or foraminal stenosis, or EMG/NCS, demonstrating radiculopathy. Furthermore, there is no documented pathological reflexes, muscle weakness, atrophy, hypertrophy, fasciculation's [sic], decreased sensation to light touch pinprick vibration or proprioception. There is no documentation of any pathology of station of the head or neck with forward flexion, nor is there any documentation of the claimant having unkempt hair supporting her report of pain. There is no documentation of antalgic gait, no spinal instability documented on x-rays, no erythema, edema, synovitis, no palpable muscle spasms.

(R. 15-5, PageID 858).

This conclusion ignores evidence of Koning's restricted range of motion, her prior spinal surgeries, the MRI results and other tests documenting degenerative disk disease, her reported and documented chronic pain, and her treating physician's findings.

Courts have held this type of selective review to be arbitrary and capricious, and have pointed out the concern for conclusions based on "logical leaps." In *Blajei v. Sedgwick Claims Management Services, Inc.*, 721 F. Supp. 2d 584, 604-05 (E.D. Mich. 2010), the district court

---

[8] "Somatic" pain and "chronic pain" is discussed in the medical literature, and differs from "acute pain":

> In general . . . there are three types of pain, based on where in the body the pain is felt: somatic, visceral, and neuropathic. Pain of all three types can be either acute or chronic. Acute pain is short lasting and usually manifests itself in ways that can be easily described and observed. Chronic pain is defined as pain lasting more than three months. It is much more subjective and not easily described as acute pain. The three pain types can be felt at the same time or singly and at different times. The different types of pain respond differently to the various pain medications. Somatic and visceral pain are easier to treat than neuropathic pain. . . .Generally speaking, somatic pain is usually aggravated by activity and relieved by rest.

http://calder.med.miami.edu/pointis/typepain.html

held that a plan administrator's decision to terminate a claimant's benefits based on conclusory reports from medical consultants was arbitrary and capricious, finding that the file review physician's report indicated that the physician had "selectively cherry-picked" the medical records to support his non-disability finding.

> Further, Dr. Pick appears to have at best haphazardly selected, and at worst cherry-picked, a handful of objective reports (MRI, CT, x-ray, EMG, etc. reports) to comment upon. Dr. Pick mentions an August *2005* lumbar x-ray that "has an impressive successful fusion at L5-S1; but does not comment upon a June *2005* cervical MRI which found "[c]ervical spondylosis . . . contributing to left greater than right stenosis."

*Id.* In finding that the file reviewing physicians' reports "are conclusory and fail to adequately discuss, let alone rebut, the diagnoses of Plaintiff's treating physicians," the court noted that the reports are also "tainted with other indicia of unreliability," including the "logical leap" that because Plaintiff can drive, she can work at a computer for 8 hours per day." *Id*. at 606. [9]

> Defendants are correct that Section 1133 does not require a denial letter to describe every detail relating to the decision to deny benefits; however, a letter completely devoid of any discussion of a claimant's medical evidence submitted to support disability, or why an IME physician's conclusions were being favored over a claimant's physician's conclusions, does not comport with ERISA's procedural requirements. *See Majeski v. Metropolitan Life Ins. Co*., 590 F.3d 478, 484 (7th Cir. 2009).

*Id*. at 611.

This case has similarly fallen short of providing the full and fair review of the record required by ERISA.

### 3. *Failing to Conduct its Own Physical Evaluation*

"[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Calvert v. Firstar Fin. Inc.,* 409 F.3d

---

[9] In this case, the nurse file reviewer includes an opinion there is no "documentation of the claimant having unkempt hair supporting her report of pain." (R. 15-5, PageID 858).

286, 297 n.6 (6th Cir. 2005). However, we have held that the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, "raise[s] questions about the thoroughness and accuracy of the benefits determination." *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (quoting *Calvert*, 409 F.3d at 295).

Here, the Plan specifically reserved the right to conduct its own examination, but chose not to. This is especially troubling because the Plan's file reviewers "second-guess[ed] [Koning's] treating physicians" and made "credibility determinations." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013). Unlike *Judge*, this is not a case where a nurse file reviewer's findings "simply echo those of [the claimant's] own doctors." *Id.*

The Plan second-guessed Koning's treating physician when it credited the assumption of the file reviewer that Koning's FCE showed she could do sedentary work over Dr. Fitzgerald's conclusion that she cannot (and despite the FCE's finding that she cannot sit for more than 30 minutes at a time). In its letter denying Koning's LTD benefits, the Plan relied primarily on the FCE as a reason for its decision to deny her benefits. However, the entire issue before the Plan was whether Koning could perform sedentary work, and Koning's treating physician, Dr. Fitzgerald, concluded that she cannot – and the FCE results supported the conclusion in its clinical assessment that she could not sit for more than 30 minutes at a time. Given that her "sedentary strength occupation" consists primarily of sitting most of the time, the Plan should have explained the basis for refusing to credit Dr. Fitzgerald's medical opinion. The above review of the Plan's decision-making process indicates that the Plan's denial of Koning's LTD benefits was in error. "While none of the factors alone is dispositive, we find that, as a whole, they support a finding that [the Plan] did not engage in a deliberate and principled reasoning

process." *Helfman*, 573 F.3d at 396. We are mindful that judicial review of these matters cannot be a "rubber stamp." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009).

### 4. Significant Change in Physical Functional Capacity

The district court below concluded that the Koning did not carry her burden to prove that she has suffered a significant change in her physical functional capacity, stating "plaintiff must establish more than a change in her subjective experience of a long-term problem with back pain; rather she must demonstrate some real, objective change in her actual capacity." (R. 29, PageID 1418). However, Koning may be able to meet this burden. She has sufficiently shown that she was able to work with her back pain for years, and when she needed to take on increasingly sedentary jobs, she did – moving from hair dresser, to salon manager, to human resources manager. When she took the position of human resources manager at American, she was able to work, and did for years. But, as Dr. Fitzgerald observed, Koning discontinued her work in this position as a result of her medical conditions that left her disabled. (R. 13-2, PageID 1585). That was a significant change in her functional capacity, as shown by objective evidence – hundreds of pages of medical records detailing back surgeries, physical therapy, and numerous pain treatment programs, and MRI's and other tets documenting degenerative disk disease.

Courts have addressed the fact that pain is an inherently subjective condition, but no less capable of being disabling. In an unpublished decision, *James v. Liberty Life Assur. Co. of Boston*, 582 Fed. App'x 581 (6th Cir. 2014), this Court affirmed the district court's award in favor of the participant. Her board-certified doctor treated her back pain with, among other modalities, epidural injections. Throughout treatment, he found the participant was unable to return to work. The plan administrator ordered independent medical examinations ("IMEs") by board certified doctors, one of whom examined the participant, and found an "absence of any

objective clinical findings to substantiate her ongoing complaints," and that she could return to work. *Id*. at 583. The plan denied her claim for long-term disability benefits, based on the IME doctors' opinions, and also in part on the review of a vocational rehabilitation company that performed an occupational analysis and reported that the sedentary nature of her work made her able to perform "the material and substantial duties of her occupation within the restrictions given by [the doctor]." *Id*. The participant filed an administrative appeal, and submitted additional medical opinions. The plan hired two additional doctors to conduct file reviews, and they considered her "self-reports of pain, the MRIs, and her symptoms and concluded that the medical evidence did not support impairment or the need for restrictions or limitations." *Id*. at 585. The plan denied her appeal, "citing a lack of objective evidence" that her conditions "precluded her from performing her job." *Id*.

The district court entered judgment in the participant's favor, finding that the preponderance of the evidence supported a conclusion that the participant was disabled from performing her regular job. On *de novo* review, this Court affirmed the district court, finding the participant "produced ample subjective and objective evidence that she was unable to return to work." *Id.* at 587. The Court specifically explained that, "[c]omplaints of pain necessarily are subjective as they are specific to the patient and are reported by the patient." *Id. See Pierzynski v. Liberty Life Assur. Co. of Boston*, No. 10–14369, 2012 WL 3248238, at *4 (E.D.Mich. Aug. 8, 2012) ("by its very nature, pain is subjective, and the [plan] cannot ignore subjective complaints"). Furthermore, the Court found that the participant produced sufficient objective evidence to support her claim. "MRIs, records of her physical examinations, chart notes, lab and other test results, and physician diagnoses, all . . . qualify as objective medical evidence under the Policy." *Id.*

**B. Remedy**

This case is similar to the case in *Helfman*, 573 F.3d at 396:

> '[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled,' remand to the plan administrator is the appropriate remedy. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006).

## V.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court in part, insofar as the district court held that the plan is subject to ERISA, and **REVERSE AND REMAND** insofar as the district court upheld the denial of benefits by the Plan, with instructions to remand to the plan administrator for a full and fair review consistent with this Court's opinion.

McKEAGUE, Circuit Judge, concurring.  I reluctantly agree with the majority that we should remand to the district court to instruct the Plan to conduct a full review and evaluate Koning's claim more thoroughly.  I write separately for two reasons.  First, I believe Koning must have presented evidence of disability around 2012, when she claims she became disabled, rather than presenting the entire record as evidence of disability—including several years where she was able to work.  Second, the majority places too much weight on the opinion of Koning's treating physician and certain favorable aspects of Koning's medical record.  I would emphasize that Koning bears the burden of proving she was disabled, and I identify what I see as Koning's evidence of disability that the Plan must evaluate on remand.

## I

The question before us is whether Koning proved she became disabled around 2012.  "To succeed in [a] claim for disability benefits under ERISA, [a p]laintiff must prove by a preponderance of the evidence that [s]he was 'disabled,' as that term is defined in the plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. for LBA Employees*, 741 F.3d 686, 700–01 (6th Cir. 2014) (citation omitted).  Here, the Plan defined "disabled" as "a significant change" in "physical functional capacity" which prevented Koning from performing at least one of the material duties of her job.[1]  R. 13-2, Policy, Page ID 134–35.  Koning presented evidence of physical problems beginning in the early 2000s and continuing until she quit working in July 2012.  Critically, Koning *continued to work* during that entire period.  Moreover, Koning did *not* present evidence that she was unable to perform any of her job duties at any point prior to 2012.  From this, we can reasonably infer that, despite her physical

---

[1] The parties present this inquiry in different ways: Koning focuses on whether she could perform all the material duties of her job, while the Plan focuses on whether Koning had a "significant change" in her physical functional capacity.  Regardless of how we frame the question, this case still comes down to whether Koning presented evidence of her disability around 2012.

problems, Koning was able to perform all the duties of her job and was *not* disabled until around 2012. As a result, Koning must have presented evidence that her condition worsened around 2012 to the point that she became disabled.

I believe the majority and I agree on this point, *see* Maj. Op. at 19–21, but I want to emphasize the relevant time period before us. Because Koning continued to work, her physical condition in the years leading up to 2012 cannot be persuasive evidence that she became disabled in 2012. If anything, it serves as evidence that Koning was *not* disabled in July 2012 unless her physical condition had changed. In my view, her prior condition only provides a baseline to evaluate what may have changed in her physical condition that rendered her unable to work, and our focus should remain on the period leading up to July 2012.

## II

With that in mind, although I agree that the Plan's review was inadequate, I disagree with the majority's characterization of some of the evidence. The majority identified the following deficiencies in the Plan's review: (1) the Plan "ignored" favorable evidence from Koning's treating physician; (2) the Plan failed to conduct its own physical examination and relied on the opinions of nurse file reviewers; and (3) the Plan selectively reviewed Koning's medical record, particularly her Functional Capacity Evaluation (FCE).

*Koning's Treating Physician.* If a plan administrator adopts an opinion that conflicts with that of a treating physician, it must provide reasons for doing so. *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548–49 (6th Cir. 2015). Plan administrators may not arbitrarily reject or refuse to consider the opinion of a treating physician, but they "are not obligated to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Accordingly, courts may not "impose on

plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.

In my opinion, the majority gives too much credit to the opinion of Dr. Fitzgerald, Koning's treating physician. Dr. Fitzgerald recommended Koning quit working in 2012, but his only explanation was that "as a result of her medical conditions, I agreed that Mrs. Koning should discontinue working." R. 13-2, Disability Statement, Page ID 159. Dr. Fitzgerald listed Koning's symptoms, her diagnoses, and her history of back problems before concluding she was "disabled." *Id.* at 158–59. But he did *not* explain why Koning was disabled as of July 2012 when she was not disabled at any point prior to that. My concern is that Dr. Fitzgerald's conclusion seems to come from the same medical evidence that had been in the record for years when Koning was not disabled.[2] So why did Dr. Fitzgerald conclude Koning was disabled in 2012? Did he diagnose her with a new ailment that prohibited her from working? Did her back problems get worse, or did he simply credit his patient's otherwise unsupported report that her previously tolerated symptoms had become unbearable? What changed in Koning's physical condition from the time when she could work with her back problems—and was therefore not disabled—to when she couldn't? Dr. Fitzgerald did not say, and without more I find his conclusion unconvincing. *See Creech v. UNUM Life Ins. Co.*, 162 Fed. App'x 445, 454–56 (6th Cir. 2006) (per curiam) (finding treating physician's opinion unpersuasive when he "fail[ed] to support his opinion with data or useful analysis").

The majority claims the Plan "ignored" favorable evidence from Dr. Fitzgerald in denying Koning's claim and "cite[d] no medical evidence in conflict with Dr. Fitzgerald's conclusions." Maj. Op. at 14–15. But, as far as I can tell, the Plan only disagreed with Dr.

---

[2] Dr. Fitzgerald had been treating Koning since 2009, and his practice had been treating Koning since 2004. Dr. Fitzgerald's statement does not mention any changes in Koning's condition from when he first began treating her in 2009 to when he concluded she was disabled in 2012.

Fitzgerald's ultimate conclusion that Koning was disabled. Koning needed to present evidence that she became disabled *around 2012*. It would have been difficult, then, for the Plan to cite evidence to refute Dr. Fitzgerald's opinion when Dr. Fitzgerald himself provided no evidence that Koning's condition changed around 2012. In other words, I find it hard to identify what evidence the majority could expect the Plan to adduce to refute Dr. Fitzgerald's unsupported and unexplained opinion.

The majority seems to regard Dr. Fitzgerald's conclusion as convincing evidence that must be rebutted. *See* Maj. Op. at 14–16. Although I agree that the treating physician's opinion is a *factor* to consider, *see Shaw*, 795 F.3d at 548–49, I do not believe a conclusory opinion like Dr. Fitzgerald's should carry much weight. And I certainly do not think we should treat it as near-determinative evidence (as the majority seems to) that Koning was disabled. The burden, of course, remains on Koning to establish disability—not on the Plan to affirmatively counter every unsubstantiated conclusion she asserts.

*The Plan's Failure to Conduct a Physical Examination.* The majority also takes issue with the Plan's use of nurse file reviewers and faults the Plan for not conducting its own physical examination. Maj. Op. at 18–19. The failure to conduct a physical exam, especially when a plan reserves the right to do so, "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). However, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Id.* at 297 n.6. And plan administrators are permitted to conduct a file-only review instead of a physical exam so long as the review considers the evidence from the treating physician. This is particularly true when file

reviewers do not make credibility determinations or second-guess treating physicians. *See Judge v. Metro Life Ins. Co.*, 710 F.3d 651, 660 (6th Cir. 2013); *Creech,* 162 Fed. App'x at 454–55.

First, I see no problem with two registered nurses and a vocational expert evaluating Koning's claim. The Plan provided that it would consult with "health care professional[s]," and to my knowledge this Court has never required that a file review be conducted by a physician. *See Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560 (6th Cir. 2013) (affirming denial of disability benefits on basis of file review conducted by nurse case manager); *Judge*, 710 F.3d at 663 (affirming denial of benefits based on nurse file review); *Iley v. Metro. Life Ins. Co.*, 261 Fed. App'x 860, 864 (6th Cir. 2008) ("[T]his court has never held that a file review by a nurse is an insufficient form of review.").

Second, from this record, I cannot conclude the file reviewers made a credibility determination or second-guessed the medical evidence of Dr. Fitzgerald. The majority classifies the Plan's disagreement with Dr. Fitzgerald's conclusion that Koning was disabled as second-guessing. *See* Maj. Op. at 19. But while the Plan disagreed with Dr. Fitzgerald's *conclusion*, it did not second-guess any of the medical evidence he referred to.[3] The Plan's reviewers were looking for evidence that Koning's condition *changed* in 2012, and (as explained above) Dr. Fitzgerald failed to cite *any* medical evidence to support a change in Koning's condition. In other words, there was no evidence—aside from Dr. Fitzgerald's unsupported conclusion—to

---

[3] The majority argues that the Plan "did not address Dr. Fitzgerald's medical opinion" because the Plan did not offer medical evidence to contradict Koning's symptoms. Maj. Op. at 15. Again, the Plan was not evaluating whether Koning had symptoms of back pain, but rather whether Koning became disabled around 2012. The Plan denied Koning's claim because it concluded none of these symptoms or diagnoses had *changed* from the time she was able to work to the time she claimed she was disabled. If Koning's symptoms were, in fact, the same in 2012 as in years past, then the Plan would not need to "address" or disagree with them to conclude Koning was not disabled.

second-guess.[4]  As such, I cannot fault the Plan for disagreeing with the unsupported conclusion of Koning's treating physician.

Ultimately, this case hinges on the actual medical evidence in the record that could show Koning became disabled around 2012.  As such, I agree with the majority that the Plan's evaluation of Koning's claim left much to be desired.  However, I would be clear as to what the Plan needs to evaluate on remand.

*Koning's Medical History and FCE.*  The majority criticizes the Plan for ignoring Koning's "prior spinal surgeries, [her] MRI results and other tests documenting degenerative disk disease, her reported and documented chronic pain, and her treating physician's findings." Maj. Op. at 17.  But much of Koning's medical history, including surgeries in 2002 and 2005 and diagnoses from years past, cannot be persuasive evidence that she became disabled around 2012.  Accordingly, we must review the Plan's evaluation in light of Koning's evidence from around 2012—her MRIs, her FCE, and her subjective reports of increased pain—always keeping in mind that Koning bears the burden of proving she was disabled.

I agree with the majority that the Plan failed to adequately explain whether Koning's MRI results and other medical evaluations evidenced a change in her condition.  Koning's July 2012 MRI indicated mild degenerative change at the C4/C5 and C5/C6 levels.  R. 16-2, MRI Report, Page ID 1052.  While that could be evidence of a change in condition, Koning's 2012 MRI results seem very similar to her August 2006 MRI results.  R. 13-2, MRI Report, Page ID 177, 178, 190.  The Plan makes no comparison between the two MRIs, and the Plan's reviewers drew at least one inconsistent conclusion from the July 2012 MRI.  Despite the 2012 MRI report clearly indicating "mild right neural foraminal narrowing at C4-5," the Plan's reviewer found no

---

[4] While the majority asserts the Plan second-guessed Dr. Fitzgerald by crediting the "assumption" that Koning could do sedentary work, the Plan's reviewer relied on the FCE's actual description of Koning's activity level as sedentary.  *See* R. 15-3, FCE, Page ID 963–64.

evidence of "foraminal stenosis [or narrowing]" in the record. R. 15-5, Medical Record Review, Page ID 858. Based on this record, Koning *may* have provided evidence that her physical condition changed around 2012. But we are not medical professionals, and this discrepancy is insufficient to enable conclusive evaluation of the Plan's decision.

Similarly, Koning's FCE *could* be evidence of disability. "A functional capacity evaluation is generally a reliable and objective method of gauging the extent one can complete work-related tasks." *Shaw*, 795 F.3d at 548 (citation omitted); *see also Brooking v. Hartford Life & Accident Ins. Co.* 167 Fed. App'x 544, 549 (6th Cir. 2006) (describing an FCE as "objective evidence" of claimant's back pain). The majority concludes the Plan selectively reviewed Koning's file by failing to account for physical limitations and restrictions found during Koning's FCE. *See* Maj. Op. at 16–18. Fair enough; the FCE does list physical limitations that could be evidence Koning became disabled around 2012. But the majority omits one glaring detail about Koning's FCE: *it appears to conclude Koning can work*, at least in some capacity. R. 15-3, FCE, Page ID 963–64. According to the Plan's vocational expert, Koning's job was classified as "sedentary," and the FCE suggested Koning *could work* at the sedentary level. R. 15-4, Occupational Analysis, Page ID 838–40; R. 15-3, FCE, Page ID 963. So while I agree the Plan's decision did not fully account for the FCE's restrictions and limitations, the majority misstates the FCE's significance. I find the FCE inconclusive at best.

Finally, I do not discredit Koning's reports of pain as providing *some* evidence that she was unable to work. *See* Maj. Op. at 20–21. As the majority explains, pain *can* be evidence of disability despite being inherently subjective. *See James v. Liberty Life Assurance Co. of Boston*, 582 Fed. App'x 581, 582 (6th Cir. 2014). However, the court awarded benefits in *James* because the claimant "produced ample subjective *and* objective evidence that she was unable to

return to work." *Id.* at 587 (emphasis added). That brings us back to our starting point: Koning bears the burden to demonstrate she is disabled—that is, that her physical condition changed around 2012 to the point where she became disabled. Although I depart from the majority's view on much of this evidence, I agree that a remand is appropriate for the Plan to consider all the evidence of disability that the Plan appears to have failed to address.

### III

Koning still bears the burden of proving that she became disabled around 2012, and on this record I am not convinced she has done so. However, I concur in remanding to the Plan to conduct a more thorough review of Koning's evidence.